# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 01-3624

JOHN DOE,

*Plaintiff-Appellant,*

v.

CITY OF LAFAYETTE, INDIANA,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Indiana,
Hammond Division.
No. 00 C 76—**Allen Sharp**, *Judge.*

———————

REARGUED EN BANC JANUARY 8, 2004—DECIDED JULY 30, 2004

———————

Before FLAUM, *Chief Judge,* and POSNER, COFFEY, EASTERBROOK, RIPPLE, MANION, KANNE, ROVNER, DIANE P. WOOD, EVANS and WILLIAMS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* In February of 2000, the City of Lafayette, Indiana, issued John Doe, a convicted sex offender, a letter, informing him that he was banned from all public parks under the City's jurisdiction. In November of 2000, Mr. Doe initiated this action, alleging that the ban violated his rights under the First and Fourteenth Amendments of the Constitution of the United States. The United States

District Court for the Northern District of Indiana granted summary judgment to the City. For the reasons set forth in the following opinion, we now affirm the judgment of the district court.

# I
# BACKGROUND

## A. Facts

John Doe has a long history of arrests and convictions for sexually related crimes. In most of these instances, children were the victims. His criminal history includes convictions for child molestation, attempted child molestation, voyeurism, exhibitionism and peeping. These crimes date back to 1978, when Mr. Doe went into a locker room at a local school, pulled down the swimsuit of a ten-year-old boy and performed oral sex on him. The next year, Mr. Doe forcibly performed oral sex on a twelve-year-old boy. He approached the boy in the parking lot of a local school and asked the boy to unzip his pants; after the boy refused, Mr. Doe unzipped the boy's pants and performed oral sex on him. In 1985, Mr. Doe admitted to peeping into windows of an apartment of a female at 1:20 a.m. In 1986, Mr. Doe admitted to masturbating in full view of three children who lived in the home next door. During questioning on this incident, the police also asked Mr. Doe if he recalled "masturbating on the back porch with one of the next door neighbor children and another friend out in the back yard." Reed Aff. Ex.D. Mr. Doe answered: "That's possible." *Id.* In May of 1988, Mr. Doe was arrested for peeping into the windows of an apartment in West Lafayette. In October of 1988, he admitted to standing outside a house, looking through a window at what he perceived to be a teenage boy and masturbating with his penis exposed. He also admitted this

behavior occurred on a number of previous occasions in then-recent history. Mr. Doe explained to police: "[I]t's happened times before, you know that. I've told you this before I'm still seeing a therapist and working on it, but I . . . . I can't make any excuses. I mean ahh it just happens. Ahh." Reed Aff. Ex.F. In May of 1990, Mr. Doe was arrested for public intoxication and resisting law enforcement following a report that he was tapping on the rear window of a female's house. In October of 1990, Mr. Doe whistled to three teenage boys—ages ten, fourteen and fifteen—and motioned for them to come into an alley near the Village Pantry. *See* Reed Aff. ¶ 4(h). He asked the boys if they wanted to receive oral sex, and he also unzipped his pants. The three boys fled the area. This incident resulted in Mr. Doe's last conviction, which was finalized in 1991. Mr. Doe was placed on house arrest from January of 1992 to January of 1996. *See* Doe Dep. at 17. He then was on probation until early January of 2000. *See id.*

We now come to the incident that precipitated the situation before us. In January of 2000, Mr. Doe's probation officer, Joe Hooker, received a call from a "confidential source," informing Officer Hooker that Mr. Doe "had been 'cruising' parks and watching young children." Reed Dep. Ex.1. The anonymous caller recounted an incident that occurred earlier that January. Mr. Doe's own description of this episode, in his deposition, vividly describes what took place:

> A.  Well, I parked my car at Parkside Pharmacy across from Murdock Park. I saw three males and two females on the ball diamond there at Murdock Park.
>
> Q.  Kids?
>
> A.  Possibly early to mid teens, so yeah, they were underage. I walked over to the ball diamond. By the time I

got over there, they were behind the—there's a drop-off, a valley or whatever down behind the ball diamond that leads over to Ferry Street, I believe. They were down in that area, and I stood there and watched them for a while, probably 15 minutes, maybe a half-hour, I said to myself: I've got to get out of here before I do something, I left.

. . .

Q. What was your purpose in going to Murdock Park that Saturday evening?

A. Well, as I was going home that night, instead of going my usual route, I took a side street, and one side street led to another, led to another, led to another, and before I knew it, I was at Columbian Park, and so then I decided just to go over to Murdock Park. I don't know. I guess I was, for whatever reason, I was in the mood of cruising.

Q. What do you mean by "cruising"?

A. Just looking to see what's there.

Q. Looking for children?

A. Mostly, yeah.

Q. Were you having those urges that night?

A. Yeah, you could probably say that, yeah, yes.

Q. When you got out of the car and walked into Murdock Park, what were you thinking about?

. . .

A. When I saw the three, the four kids there, my thoughts were thoughts I had before when I see children, possibly expose myself to them, I thought about the possibility of, you know, having some kind of sexual

> contact with the kids, but I know with four kids there, that's pretty difficult to do. It's a wide open area. Those thoughts were there, but they, you know, weren't realistic at the time. They were just thoughts.

Doe Dep. at 27-29.

Officer Hooker forwarded the information from the anonymous caller to the Lafayette Police Department. Robert Reed, Lafayette's Police Chief, was aware of Mr. Doe's criminal history, and he initiated discussions with various officials regarding the appropriate response. He contacted Vicki Mayes, Superintendent of the Lafayette Parks and Recreation Department, and Dr. Ed Eiler, Superintendent of the Lafayette School Corporation, and advised them to issue a ban ordering Mr. Doe not to enter the City's public parks or schools. Chief Reed explained that he gave this advice "because of the duty I have to protect the citizens, and specifically the children of this community, from the imminent danger posed by John Doe." Reed Aff. ¶ 5.

On February 2, 2000, Superintendent Mayes sent a letter to Mr. Doe informing him that he was prohibited from entering the City's parks,[1] and, on February 3, 2000, Dr. Eiler sent Mr. Doe a letter informing him that he was prohibited from coming on school grounds. Neither of the bans, which are still in effect, have a termination date nor are they limited to certain geographical areas within the public prop-

---

[1] The City has a variety of parks, some large and some small, some in neighborhoods and some not, some developed and some undeveloped. Within the parks are numerous traditional playground areas, softball fields, swimming pools, a zoo and a golf course. The City's park system also hosts a range of activities, including birthday parties, family reunions and an annual Easter egg hunt. *See* Mayes Dep. at 4-10.

erty at issue. In this case, Mr. Doe challenges only the ban from the public parks, and not the public schools. He claims that he would like to go to the parks to play softball, watch the Colt World Series,[2] attend a company outing if one takes place at one of the City's parks and take walks with friends. *See* Doe Aff. ¶ 7. However, Mr. Doe also testified that, other than the January 2000 evening in question, he has not been in a city park since his 1990 arrest. *See* Doe Dep. at 30.

Mr. Doe is currently continuing therapy under the supervision of Dr. Patricia C. Moisan-Thomas. From 1986 until his 1990 arrest, he saw Dr. Moisan-Thomas "off and on . . . probably maybe once a month." Doe Dep. at 31. From 1990 to present, he has seen her "pretty much on a weekly basis." *Id.* Mr. Doe also currently attends a self-help group for sexual addicts, and, at some point after January of 2000, he voluntarily began taking medications to control his sexual urges. *See* Moisan-Thomas Dep. at 20. Mr. Doe and Dr. Moisan-Thomas both testified that "Mr. Doe, like any other addict, does not have control over his thoughts" and that he "will always have inappropriate thoughts." Moisan-Thomas Aff. ¶ 9; Doe Aff. ¶ 6 ("I recognize that I will always have inappropriate thoughts regarding having sexual contact with children."). Mr. Doe and Dr. Moisan-Thomas also believe that, in the last ten years, he has learned how to resist these inappropriate urges. Moisan-Thomas Dep. at 27, 33-34; Doe Aff. ¶ 6. In this regard, Dr. Moisan-Thomas opined that the January incident in the park was a "good thing," at least for Mr. Doe, because "[i]t gave him the opportunity to use his relapse prevention program and to learn about his limits." Moisan-Thomas Dep. at 27-28. Still, Dr. Moisan-Thomas readily concedes that she can give "absolutely no[ ]" guar-

---

[2]  According to the record, "Colt" is a baseball "league of young fifteen, sixteen, [and] seventeen-year-old males." Mayes Dep. at 6.

antee that Mr. Doe will not reoffend, and, when asked if sexual addicts, such as Mr. Doe, "do fall down that slippery slope sometimes," Dr. Moisan-Thomas responded: "Sometimes they do." *Id.* at 35.

## B. District Court Proceedings

On September 14, 2001, the United States District Court for the Northern District of Indiana granted summary judgment to the City on Mr. Doe's claims under the First and Fourteenth Amendments. *See Doe v. City of Lafayette,* 160 F. Supp. 2d 996 (N.D. Ind. 2001).

### 1. First Amendment Claim

The district court began by noting that "[o]rdinarily, in order for a violation of the First Amendment to occur, there first must be some form of expressive speech or conduct that is intended to convey a message." *Id.* at 1000. However, the court held, Mr. Doe had not articulated any form of expressive conduct which was impinged by his ban from the City's parks. Furthermore, the district court rejected Mr. Doe's contention that his right to freedom of thought was infringed because he was being punished merely for inappropriate thoughts. "[N]ot only did he have these thoughts," the court explained, "but . . . he acted upon them by going to the Park and actively seeking out the children." *Id.* at 1001. The court concluded by holding that, to the extent the ban had any impact on Mr. Doe's thoughts, that impact was incidental, and a mere incidental impact upon a citizen's thoughts does not bar a municipality from advancing a legitimate governmental interest, such as protection of its youth. *See id.* at 1000-01 (discussing *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 67 (1973) ("[T]he mere fact that, as a

consequence, some human 'utterances' or 'thoughts' may be incidentally affected does not bar the State from acting to protect legitimate state interests.")). Accordingly, the court held that the ban did not infringe any of Mr. Doe's First Amendment rights.

## 2. Fourteenth Amendment Claim

The district court began by framing Mr. Doe's Fourteenth Amendment substantive due process claim as follows: "Doe claims that the ban order violates his alleged fundamental right to enjoy and wander through a public park." *Id.* at 1001. The court noted that a plurality of the Supreme Court in *City of Chicago v. Morales*, 527 U.S. 41 (1999), stated: "[F]reedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause." *Id.* at 53. However, the district court held *Morales* inapplicable to this case because Mr. Doe's "purposes" for going in the park were not "innocent."[3] *City of Lafayette*, 160 F. Supp. 2d at 1002. The district court also considered *Morales* inapplicable because it "was decided primarily on grounds of over breadth and vagueness," and the court found those issues were not implicated in this case. *Id.* Apart from *Morales*, the court also rejected the notion that there was a broader fundamental right to intrastate travel or freedom of movement

---

[3] The district court noted that Mr. Doe submitted several "innocent" activities for which he would like to enter the parks, such as softball. "However," the court explained, "Doe has not used the city's park system for such normal innocent purposes within the previous ten years, rather his only visit to the park was in response to his sexual urge to watch innocent children play in the park and act in some criminal or inappropriate manner with those children." *Doe v. City of Lafayette*, 160 F. Supp. 2d 996, 1002 (N.D. Ind. 2001).

implicated by the ban. *Id.* at 1003 (discussing, among other cases, *Thompson v. Ashe*, 250 F.3d 399, 406-07 (6th Cir. 2001)).

Because it had determined that Mr. Doe's substantive due process claim did not implicate a fundamental right, the district court then considered the ban under a rational basis standard. It concluded that the City had a strong and legitimate interest in protecting its youth. It further concluded that the ban was "narrowly tailored to the specific facts and circumstances involving Doe and therefore advances the legitimate goals of the city." *Id.* at 1004. Therefore, the court held, the ban did not violate Mr. Doe's right to substantive due process.

## II

## DISCUSSION

Mr. Doe, by his own admission, is a sexual addict with a proclivity toward children. He always will have sexual urges toward children; the only question is whether he can control them. On the January 2000 evening in question, his control was, charitably stated, marginal. He was having sexual urges toward children; he went "cruising" in the parks in search of children; he saw children at Murdock Park; he got out of his car and he "thought about the possibility of, you know, having some kind of sexual contact with the kids." Doe Dep. at 28-29. Mr. Doe brought himself to the brink. Fortunately for the children, and Mr. Doe, there were at least four children there,[4] and Mr. Doe "kn[ew] with four kids there, that's [having sexual contact with children] pretty difficult

---

[4] Mr. Doe earlier testified that there were five children at Murdock Park that evening. *See* Doe Dep. at 27.

to do. It's a wide open area. Those thoughts were there, but they, you know weren't realistic at the time. They were just thoughts." *Id.*

What if there were only one child there that evening? Would Mr. Doe have succumbed to his urges and considered the opportunity more "realistic"? Mr. Doe's deposition testimony suggests the answer. Fortunately, on that January evening, Mr. Doe passed up the opportunity to gratify completely his urges. Fortunately as well, through an anonymous caller, the City of Lafayette found out that Mr. Doe had engaged in psychiatric brinkmanship and endangered some of the City's most vulnerable citizens, children, in a place where children should be safe to enjoy the premises, but where, unfortunately, they also are quite susceptible to abuse, a park. Of course, the City was aware of not only this incident, but also of Mr. Doe's criminal history. City officials understandably concluded that they had a duty to take action to protect the children. The course they chose was to ban Mr. Doe from the City's parks.

Mr. Doe does not believe that the officials' chosen course was a constitutionally permissible one. He submits that the First and Fourteenth Amendments of the Constitution prohibit the City from taking this action. The district court disagreed; it granted summary judgment to the City. We review that decision de novo. *See Rogers v. City of Chicago,* 320 F.3d 748, 752 (7th Cir. 2003).

## A. First Amendment Claim

The First Amendment states in relevant part: "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Our first task is to ascertain whether any of the values protected by this provision are implicated in the situation before us.

**1.**

At the core of the First Amendment is the protection of the right to self-expression. Constitutional jurisprudence gives this constitutional value a generous ambit, protecting self-expression in its myriad forms.[5]

Keeping in mind the broad scope of this constitutional protection, we nevertheless find no such value at stake in the factual record before us. Mr. Doe makes very clear why he went to the park. He did not go to the park to advocate the legalization of sexual relations between adults and minors. He did not go into the park to display a sculpture, read a poem or perform a play celebrating sexual relations between adults and minors. He did not go into the park for some higher purpose of self-realization through expression. In fact, he did not go into the park to engage in expression at all. Rather, he went "cruising" in the parks "looking for children" to satisfy his sexual urges. He certainly was aware of his propensity in this regard and, of course, of his history of sexual assault. Nevertheless, he put himself in a situation that increased, substantially, the not-so-remote possibility of his acting on these impulses. On this factual record, it is difficult to ascertain how the freedom of self-expression is implicated.[6]

---

[5] For example, protection has been extended to the reading of obscene material in one's home, *see Stanley v. Georgia*, 394 U.S. 557 (1969), profanity, *see Cohen v. California*, 403 U.S. 15 (1971), symbolic expression, *see Texas v. Johnson*, 491 U.S. 397 (1989), flag burning, *see id.*, and commercial speech, *see Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976).

[6] Notably, Mr. Doe has not claimed that the ban is overbroad be-cause it prohibits too much speech or expression. Indeed, there is

(continued...)

There can be no doubt that, among the kinds of expression protected by the First Amendment is conduct with a significant expressive element. The Supreme Court has long held that the First Amendment protects a broad range of speech *and* conduct, but only "conduct with a significant expressive element that drew the legal remedy in the first place." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986). This principle is well-established. *See United States v. O'Brien*, 391 U.S. 367, 376 (1968) (articulating and applying a four-part test for judging the validity of content-neutral regulations that incidentally impact expression). More recent pronouncements of the Supreme Court have confirmed its viability. *See Arcara*, 478 U.S. at 706-07. Our own case law has reiterated this rule. *See Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1057 (7th Cir. 2004) (explaining that the *O'Brien* test and the time, place and manner analysis of *Ward v. Rock Against Racism*, 491 U.S. 781 (1989), "can be applied only to governmental regulation of conduct that has an expressive element or to regulations directed at activity with no expressive component but which nevertheless impose a disproportionate burden on those engaged in protected First Amendment activity"). Indeed, although the Supreme Court has defined the boundaries of expression broadly, *see supra* n.5, it never has extended the protections of the First Amendment to non-expressive conduct.

Consequently, Mr. Doe's prohibition from the park only triggers First Amendment scrutiny if he can demonstrate

---

[6] (...continued)
nothing in the record to suggest that Mr. Doe has ever used the City's parks for expression, and his stated reasons for wanting to use the parks in the future are unrelated to expression. *See* Doe Aff. ¶ 7.

that his conduct in going to the park in search of children to satisfy deviant desires somehow was infused with an expressive element. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) ("[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive."). Like the illegal sexual activity being regulated in *Arcara*, it is indisputable that Mr. Doe's urges and actions "manifest[ ] absolutely no element of protected expression," *Arcara*, 478 U.S. at 705, and the City's ban "bears absolutely no connection to any expressive activity," *id.* at 707 n.3. In *Arcara*, the Court pointedly compared the illegal sexual activity at issue in that case to the sort of conduct intimately related to expression that the Court has held to be worthy of protection under the First Amendment. *See id.* (citing *Grayned v. City of Rockford*, 408 U.S. 104 (1972) (demonstration results in prosecution under antinoise ordinance); *Marsh v. Alabama*, 326 U.S. 501 (1946) (trespass in order to distribute religious literature); *Cantwell v. Connecticut*, 310 U.S. 296 (1940) (breach of peace prosecution based upon distribution of religious literature)). The conduct at issue in our case certainly contains no more of an expressive element than the activity at issue in *Arcara* and therefore deserves no protection under the First Amendment.

In short, because there is no expression at issue, First Amendment doctrine simply has no application here.[7] In

---

[7] Even if we were to determine that Mr. Doe's sexual urges some-how triggered First Amendment scrutiny, they would be excepted from First Amendment protection under the incitement and obscenity doctrines. Given the context in which the urges occurred

(continued...)

deed, we have nothing approaching "expression"; instead, we have predation.

**2.**

Mr. Doe further suggests that the City is punishing him for his private thoughts.

A government entity no doubt runs afoul of the First Amendment when it punishes an individual for pure thought. The Supreme Court has held that the First Amendment prohibits the government from commanding a citizen to profess or disseminate an ideological message contrary to that citizen's conscience, *see Wooley v. Maynard*, 430 U.S. 705, 713 (1977); *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633-34 (1943), and from screening certain types of

---

[7] (...continued)

and the action they precipitated, they were, in a very real sense, "directed to inciting or producing imminent lawless action and [were] likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). Fueled by his urges, and knowing of his dangerous propensity, Mr. Doe put himself in a position where he could have and would have acted to satisfy those desires if the children had been fewer in number or, it appears, if one of the children had wandered sufficiently away from the others. Furthermore, Mr. Doe's urges, if they triggered First Amendment scrutiny, would be characterized as a form of child pornography, the possession and distribution of which has been held unprotected by the Supreme Court. *See Osborne v. Ohio*, 495 U.S. 103, 109-11 (1990); *New York v. Ferber*, 458 U.S. 747, 756 (1982). Of course, as we point out in the text, it is quite unrealistic even to talk about these doctrines in this case. They assume some form of "expression," broadly defined, to necessitate First Amendment scrutiny in the first place; that expression is simply missing here.

stimuli from flowing to a citizen under the guise of mind control, *see Stanley v. Georgia*, 394 U.S. 557, 565-66 (1969) ("Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds. . . . Whatever the power of the state to control public dissemination of ideas inimical to the public morality, it cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts."). Closer to this case, the Court also has indicated that the government cannot regulate mere thought, unaccompanied by conduct. *See Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 67-68 (1973) ("The fantasies of a drug addict are his own and beyond the reach of government, but government regulation of drug sales is not prohibited by the Constitution.").

The Supreme Court, however, has made it clear that only governmental regulations aimed at *mere* thought, and not thought plus conduct, trigger this principle. That is, regulations aimed at conduct which have only an incidental effect on thought do not violate the First Amendment's freedom of mind mandate. *Id.*; *Osborne v. Ohio*, 495 U.S. 103, 109 (1990). Limiting First Amendment protection to pure thought is rooted in common-sense. Thought and action are intimately entwined; consequently, all regulation of conduct has some impact, albeit indirect, on thought. Cases such as *Paris Adult Theatre I* and *Osborne* simply state what most of us probably intuit: The First Amendment's freedom of mind principle does not subject every conduct-focused regulation to First Amendment scrutiny; rather, it only prohibits those regulations aimed at pure thought and thus mind control.

In *Paris Adult Theatre I*, for example, the Supreme Court rejected a freedom of thought challenge to a Georgia law that prohibited the display or distribution of obscene materials, explaining:

> It is also argued that the State has no legitimate interest in "control [of] the moral content of a person's thoughts,"

> *Stanley v. Georgia*, [394 U.S. 557, 565 (1969)], and we
> need not quarrel with this. But we reject the claim that
> the State of Georgia is here attempting to control the
> minds or thoughts of those who patronize theaters.
> Preventing unlimited display or distribution of obscene
> material, which by definition lacks any serious literary,
> artistic, political, or scientific value as communication,
> *Miller v. California*, [413 U.S. 15, 24, 34 (1973)], is distinct
> from a control of reason and the intellect. *Cf. Kois v.
> Wisconsin*, 408 U.S. 229 (1972); *Roth v. United States*, [354
> U.S. 476, 485-87 (1957)]; *Thornhill v. Alabama*, 310 U.S. 88,
> 101-02 (1940); Finnis, *"Reason and Passion": The Constitu-
> tional Dialectic of Free Speech and Obscenity*, 116 U. Pa. L.
> Rev. 222, 229-30, 241-43 (1967). Where communication of
> ideas, protected by the First Amendment, is not in-
> volved, or the particular privacy of the home protected
> by *Stanley*, or any of the other "areas or zones" of
> constitutionally protected privacy, the mere fact that, as
> a consequence, some human "utterances" or "thoughts"
> may be incidentally affected does not bar the State from
> acting to protect legitimate state interests. *Cf. Roth v.
> United States*, 354 U.S. at 483, 485-87; *Beauharnais v.
> Illinois*, [343 U.S. 250, 256-57 (1952)].

413 U.S. at 67. Likewise, in *Osborne*, the Supreme Court
considered the constitutionality of an Ohio ordinance that
prohibited, with narrow exceptions, the possession or viewing
of "any material or performance that shows a minor who is
not the person's child or ward in a state of nudity." 495 U.S.
at 106 (quoting Ohio Rev. Code Ann. § 2907.323(A)(3)
(Supp. 1989)). In rejecting Osborne's First Amendment ar-
guments, the Court distinguished its freedom of thought
precedent: "The difference here is obvious: The State does
not rely on a paternalistic interest in regulating Osborne's
mind. Rather, Ohio has enacted § 2907.323(A)(3) in order to
protect the victims of child pornography; it hopes to destroy
a market for the exploitative use of children." *Id.* at 109.

Although we can accept in the abstract Mr. Doe's argument that a government may not punish pure thought, we cannot accept his further submission that, in subjecting him to this ban, the City "punished"[8] him for "pure thought."

---

[8] It is important to note that the City, in banning Mr. Doe from the parks, was not "punishing" him at all. Rather, the ban was a civil (i.e., nonpunitive) measure designed for the protection of the public. *See Smith v. Doe*, 538 U.S. 84, 105-06 (2003) (finding the Alaska sex offender registration statute nonpunitive); *see also Kansas v. Hendricks*, 521 U.S. 346, 360 (1997) (explaining regarding Hendricks, the challenger of the civil commitment statute at issue: "This admitted lack of volitional control, coupled with a prediction of future dangerousness, adequately distinguishes Hendricks from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings"). It is unquestionable that a governmental entity has broader powers to operate both substantively and procedurally in the civil, as opposed to criminal (i.e., punitive), context. *See generally* Mary M. Cheh, *Constitutional Limits on Using Civil Remedies To Achieve Criminal Law Objectives: Understanding and Transcending the Criminal-Civil Law Distinction*, 42 Hastings L.J. 1325, 1343-44 (1991) ("The Court has approved such regulatory measures as pretrial detention, detention during wartime and insurrection, detention of resident aliens pending deportation proceedings, post-arrest detention of juveniles, detention of criminal defendants who are incompetent to stand trial, and the involuntary commitment of mentally ill persons who are a danger to themselves or to others." (footnotes omitted)); *see also id.* at 1331 (noting civil and criminal trials "follow different rules of procedure, burdens of proof, and rules of discovery"). In fact, this case fairly can be characterized as a form of "civil exclusion," and the Supreme Court has held that the Constitution affords latitude to governments to commit dangerous persons, such as sexual predators, in order to protect the public. *See Hendricks*, 521 U.S. at 357 (upholding Kansas' civil commitment statute which permitted detention

(continued...)

The City has not banned him from having sexual fantasies about children. It did not ban him from the public parks because he admitted to having sexual fantasies about children in his home or even in a coffee shop. The inescapable reality is that Mr. Doe did not simply entertain thoughts; he brought himself to the brink of committing child molestation. He had sexual urges directed toward children, and he took dangerous steps toward gratifying his urges by going to a place where he was likely to find children in a vulnerable situation.

To characterize the ban as directed at "pure thought" would require us to close our eyes to Mr. Doe's actions. It also would require that we give short shrift to Mr. Doe's condition as an admitted pedophile who continues to have difficulty controlling his urges. The law has long recognized

---

[8]  (...continued)
when a person "has been convicted of or charged with a sexually violent offense," and "suffers from a mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence" (quoting Kan. Stat. Ann. § 59-29a02(a) (1994))); *see also Kansas v. Crane*, 534 U.S. 407 (2002) (elaborating on *Hendricks*).

The fact that the City's actions are understood appropriately not as "punishment," but as a civil measure designed to protect its youth, renders irrelevant the argument that Mr. Doe's actions were not of sufficient gravity to justify *punishment*. The City was not bound to wait until Mr. Doe again committed the crime of child molestation or attempted child molestation in order to act. It had the power to address Mr. Doe's actions outside the criminal law context and did exactly that. *See Smith*, 538 U.S. at 93 ("[A]n imposition of restrictive measures on sex offenders adjudged to be dangerous is a legitimate nonpunitive governmental objective and has been historically so regarded." (internal quotation marks and citation omitted)).

that not every individual is equally capable of controlling his desires and preventing them from becoming actions which injure others. *See Smith v. Doe*, 538 U.S. 84, 93 (2003) (explaining, in upholding Alaska's sex offender registration statute, that "an imposition of restrictive measures on sex offenders adjudged to be dangerous is a legitimate nonpunitive governmental objective and has been historically so regarded" (internal quotation marks and citation omitted)). As Justice Holmes wrote, "the character of every act depends upon the circumstances in which it is done." *Schenck v. United States*, 249 U.S. 47, 52 (1919). Mr. Doe is an admitted sexual addict with a proclivity toward children; as such, he belongs to a group of persons who are more susceptible to having sexual desires with respect to children *and* to acting on those urges. We cannot ignore, nor can we say the law somehow commands the City to ignore, Mr. Doe's pedophilia and the history of his battle with that affliction. Facing this reality certainly does not license society, acting through government, to exile, harass or marginalize Mr. Doe, but it permits government to fulfill its responsibility to protect vulnerable children in dangerous situations.

In short, we must recognize the actual situation confronting the City as well as the parents and children who look to that City for protection. The children and their parents are not concerned about Mr. Doe's thoughts. They are concerned about his coming to the park to achieve sexual gratification. They do not need to wait until a child is molested to take steps to protect their children. The First Amendment does not prohibit the City from taking the action it did to protect its children. It does not require the City to act in an ostrichlike fashion and expose the children of the City to the risk that, on a future date, a child will wander further from the group, present a better opportunity and experience the tragic consequences.

### B. Fourteenth Amendment Claim

The Due Process Clause of the Fourteenth Amendment provides that the state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The case law acknowledges two distinct strands of analysis under this Clause. The first—procedural due process—allows the government to deprive a citizen of "life, liberty, or property" only in accordance with certain procedural protections. Mr. Doe did not raise this issue in the district court, and he has not raised it in this court. We therefore have no occasion to address this issue and express no view with respect to the City's treatment of Mr. Doe in this regard.

Mr. Doe relies exclusively on the other strand of due process analysis: substantive due process. When viewing the Clause from this perspective, the Supreme Court has emphasized that the appropriate inquiry is not whether governmental authorities afforded the individual certain procedural protection. Rather, the inquiry is whether the individual has been subjected to "the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice." *Bank of Columbia v. Okely*, 17 U.S. (4 Wheat.) 235, 244 (1819), *quoted in County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998), and *Hurtado v. California*, 110 U.S. 516, 527 (1884).[9]

---

[9] *See also Daniels v. Williams*, 474 U.S. 327, 331 (1986) ("This history reflects the traditional and common-sense notion that the Due Process Clause, like its forebear in the Magna Carta, was intended to secure the individual from the arbitrary exercise of the powers of government." (internal quotation marks and citations omitted)); *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) ("The touchstone of due process is protection of the individual against (continued...)

**1.**

Our first duty is to provide a "careful description" of the liberty interest that Mr. Doe seeks to have protected. *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). Then, we must ask whether that interest is "fundamental," that is, whether it is "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it] were sacrificed." *Id.* at 720-21 (internal quotation marks and citations omitted). In undertaking these inquiries, we must remain mindful of the Supreme Court's admonition that

> we ha[ve] always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court.

---

[9] (...continued)
arbitrary action of government."); *DeTomaso v. McGinnis*, 970 F.2d 211, 213 (7th Cir. 1992) ("Protection against 'arbitrary' action is a form of substantive due process . . . ."); *Wroblewski v. City of Washburn*, 965 F.2d 452, 457 (7th Cir. 1992) ("The due process clause has historically been held to forbid arbitrary infringements of certain personal immunities that are implicit in the concept of ordered liberty, and infringements that shock the conscience." (internal quotation marks and citations omitted)); *Singleton v. Cecil*, 176 F.3d 419, 432-33 (8th Cir. 1999) (Richard S. Arnold, J., dissenting).

*Id.* at 720 (internal quotation marks and citations omitted); *see also Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1129 (7th Cir. 1995).

Providing a careful description of the right at hand is a question of framing, often a difficult one. The difficulty arises because rights can be characterized in numerous ways, and the characterization of a right plausibly can fall at a number of points along a continuum of generality. These difficulties, however, are constrained by two factors. First, and perhaps most obvious, we are constrained by the factual record before us, which sets the boundaries of the liberty interest *truly* at issue in the case. Second, the Supreme Court has limited, significantly, the level of generality at which we may define a right. Our "careful description" of the asserted right must be one that is specific and concrete, one that avoids sweeping abstractions and generalities.[10] *See Khan v. Gallitano*, 180 F.3d 829, 833-34 (7th Cir. 1999) (discussing *Glucksberg*, 521 U.S. at 722). This specificity is necessary in

---

[10] This precision in describing the asserted liberty interest is seen starkly in *Washington v. Glucksberg*, 521 U.S. 702 (1997). In *Glucksberg*, the Court faced a substantive due process challenge to a Washington statute that prohibited "caus[ing]" or "aid[ing]" a suicide. 521 U.S. at 705 (quoting Wash. Rev. Code § 9A.36.060(1) (1994)). The challengers to the statute were a group of physicians who sought to perform physician-assisted suicide and a group of patients who sought their assistance. *Id.* at 707-08. The Court rejected broadly cast characterizations of the liberty interest at issue presented by the appellate court, *id.* at 722 ("right to die"), and by the challengers, *id.* at 722-23 ("liberty to choose how to die," a right to "control of one's final days," "the right to choose a humane, dignified death" and "the liberty to shape death"). It concluded the interest at stake was much narrower: "a right to commit suicide which itself includes a right to assistance in doing so." *Id.* at 723.

order to "rein in the subjective elements that are necessarily present in due process judicial review." *Glucksberg*, 521 U.S. at 722; *see also Hutchins v. Dist. of Columbia*, 188 F.3d 531, 554 (D.C. Cir. 1999) (Rogers, J., concurring in part and dissenting in part) ("Courts must carefully define the contested right, employing sufficient specificity to ground the right in a concrete application and sufficient generality to connect the right to its animating principles.").

In the case before us, our inquiry can be forwarded most easily by first describing what rights are *not* at stake. It is much too broad, and inconsistent with the record, to characterize Mr. Doe's liberty interest as involving a generalized right to movement. *See Johnson v. City of Cincinnati*, 310 F.3d 484, 495 (6th Cir. 2002) (noting that a generalized right to freedom of movement connotes "interstate and international travel components"). The City asserts a narrower version of this concept when it claims that the right at issue is the right to intrastate travel, i.e., the right to "travel locally through public spaces and roadways." *Id.* However, this perspective, while more precise, does not reflect accurately the gist of Mr. Doe's complaint. Notably, Mr. Doe is not claiming that the ban inhibits his right to travel *through* parts of the City to engage in religious, political, commercial and social activities; rather, he is claiming the ban infringes his right to enter *into* particular types of public facilities and to stay there for certain purposes.

Mr. Doe asserts that he seeks a right to enter the parks to loiter or for other innocent purposes.[11] Although we could

---

[11] Mr. Doe submits that the liberty at issue is the "basic right to wander and loiter in public parks." Appellant's Br. at 16. At this point in the proceedings, we must take as true that assertion. We note, however, that the record contains scant evidence to support
(continued...)

say with certainty this right is not unimportant, we cannot say that existing authority establishes that it is "fundamental." It certainly is an uncomfortable fit with the liberty interests that the Supreme Court, as noted in *Glucksberg*, has determined to be fundamental:

> the right[ ] to marry, *Loving v. Virginia*, 388 U.S. 1 (1967); to have children, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942); to direct the education and upbringing of one's children, *Meyer v. Nebraska*, 262 U.S. 390 (1923); to marital privacy, *Griswold v. Connecticut*, 381 U.S. 479 (1965); to use contraception, *id.*; *Eisenstadt v. Baird*, 405 U.S. 438 (1972); to bodily integrity, *Rochin v. California*, 342 U.S. 165 (1952); and to abortion, [*Planned Parenthood*

---

[11] (...continued)
the assertion that Mr. Doe truly is seeking a right to enter parks "*to wander and loiter*." Mr. Doe submitted an affidavit in which he stated that he would like to go to the parks to play softball, watch the Colt World Series, attend a company outing if one takes place at one of the City's parks and take walks with friends. *See* Doe Aff. ¶ 7. However, according to the record, at least since 1990, he has not entered a City of Lafayette Park except on the January 2000 evening in question. *See* Doe Dep. at 30; *see also* Moisan-Thomas Dep. at 36 (noting that it is "unlikely" that Mr. Doe would want to take a walk through the park). On this night, he was not simply wandering or loitering or seeking other innocent activities; rather, driven by his sexual appetite for children, he went into a park in search of children to satisfy those desires. To the extent Mr. Doe seeks a right to enter parks to prey on children, it goes without saying that no such right exists, and, even if it did, it would be far from "fundamental." *Cf. City of Chicago v. Morales*, 527 U.S. 41, 53 (1999) (plurality) ("[T]he freedom to loiter *for innocent purposes* is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment." (emphasis added)).

> of Southeastern Pennsylvania v. Casey, 505 U.S. 833 (1992)]. We have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment. [Cruzan v. Dir., Missouri Dep't of Health, 497 U.S. 261 (1990)].

Glucksberg, 521 U.S. at 720. It is also helpful to compare Mr. Doe's asserted liberty interest to enter parks to the more analogous right to intrastate travel, which some, but not all of our sister circuits, have held "fundamental." Compare, e.g., Johnson, 310 F.3d at 498 (recognizing as fundamental "the right to travel locally through public spaces and roadways") and Ramos v. Town of Vernon, 353 F.3d 171, 176 (2d Cir. 2003) (accord), with Wright v. City of Jackson, 506 F.2d 900, 902-03 (5th Cir. 1975) (rejecting, without extended discussion, a fundamental right to intrastate as opposed to interstate travel).

These rights, according to the Supreme Court (and in the case of intrastate travel, some of our sister circuits) have a powerful historical and precedential pedigree that supports the conclusion that they are "objectively, deeply rooted in this Nation's history and tradition." Glucksberg, 521 U.S. at 720-21; see, e.g., Loving v. Virginia, 388 U.S. 1, 12 (1967) ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men."). When we compare Mr. Doe's asserted liberty interest with those which have been held fundamental, we are bound to the conclusion that Mr. Doe's asserted right to enter the parks to loiter is not on the same footing; it is not "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it] were sacrificed." Glucksberg, 521 U.S. at 721. Mr. Doe is not prohibited from making decisions regarding who he wishes to marry, the scope of his family and his relationship with his family

members. *Cf. Loving v. Virginia*, 388 U.S. 1 (1967); *Griswold v. Connecticut*, 381 U.S. 479 (1965); *Skinner v. Oklahoma*, 316 U.S. 535 (1942). He is not prohibited from making the decision to end his own life by refusing medical treatment. *Cf. Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261 (1990). He is not limited in moving from place to place within his locality to socialize with friends and family, to participate in gainful employment or to go to the market to buy food and clothing. *Cf. Johnson*, 310 F.3d at 498 (The right to intrastate travel is "an everyday right, a right we depend on to carry out our daily life activities. It is, at its core, a right of function.").[12] By banning Mr. Doe from the parks, the City only has deprived him of the "right" to go the City's parks which he wishes to use for allegedly innocent, recreational purposes. That this right is not "fundamental" to Mr. Doe's personhood is readily apparent not only from a comparison to other "fundamental" rights, but also from the fact that Mr. Doe has not even entered the City's parks since at least 1990.

The historical and precedential support for a fundamental right to enter parks for enjoyment is, to put it mildly, oblique. Notably, Mr. Doe's argument contains a dearth of

---

[12] Even the rights to refuse unwanted medical treatment and to intrastate travel, which have much more fundamental implications than the right to enter the park to loiter, have not easily found their way into the "fundamental" category. *See Glucksberg*, 521 U.S. at 720 (noting that perhaps the right to refuse unwanted medical treatment was held fundamental in *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990)); *Hutchins v. Dist. of Columbia*, 188 F.3d 531 (D.C. Cir. 1999) (wrestling with the question of whether the right to intrastate travel is fundamental); *Wright v. City of Jackson*, 506 F.2d 900, 902-03 (5th Cir. 1975) (rejecting, without extended discussion, a fundamental right to intrastate as opposed to interstate travel).

historical sources. He cites no case, state or federal, that has held that the right to enter the park to loiter or for other enjoyment purposes is "fundamental," as that term is understood in substantive due process doctrine. Mr. Doe's reliance on a handful of vagueness and overbreadth cases, such as *Papachristou v. City of Jacksonville*, 405 U.S. 156, 157 n.1, 164 (1972) (striking down as unconstitutionally vague a statute that made criminal, among other things, "wandering or strolling around from place to place without any lawful purpose or object" and noting "these activities are historically part of the amenities of life as we have known them"), are simply inapposite. Similarly, we believe that the plurality statement in *City of Chicago v. Morales*, 527 U.S. 41 (1999), is of no appreciable help. In that statement, Justice Stevens, joined by Justices Souter and Ginsburg, stated:

> [T]he freedom to loiter for innocent purposes is part of the "liberty" protected by the Due Process Clause of the Fourteenth Amendment. We have expressly identified this "right to remove from one place to another according to inclination" as "an attribute of personal liberty" protected by the Constitution. *Williams v. Fears*, 179 U.S. 270, 274 (1900); *see also Papachristou v. Jacksonville*, 405 U.S. 156, 164 (1972). Indeed, it is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is "a part of our heritage," *Kent v. Dulles*, 357 U.S. 116, 126 (1958), or the right to move "to whatsoever place one's own inclination may direct" identified in Blackstone's Commentaries. 1 W. Blackstone, Commentaries on the Laws of England 130 (1765).

*Id.* at 53. As an initial matter, we note that it is not at all clear, and indeed, quite improbable, that Justice Stevens undertook in this statement any type of fundamental rights

analysis.[13] This language, while perhaps some support for the general right to intrastate travel, cannot be read as the

---

[13] As Professors Rotunda and Nowak have explained:

> In *Chicago v. Morales*, the Supreme Court invalidated a law that gave a police officer the authority to order individuals to disperse whenever the police officer believed the group of people who were gathered together in a public place involved one or more "street gang" members who were "loitering." Justice Stevens wrote for six Justices in finding that the law violated due process, because it was so vague that it allowed totally arbitrary and capricious enforcement by police officers. However, the portion of Justice Stevens's opinion that described the law as restricting "liberty" was joined only by three Justices. The dissenters attacked the majority, and the plurality opinion, for protecting an activity that they believed was not a fundamental constitutional right and was a constitutionally protected liberty interest.
>
> The *Morales* case did not require any fundamental rights analysis. In the portion of his opinion that was written for only three Justices, Justice Stevens noted that the Court was not ruling that the ability to stay on a sidewalk was a fundamental constitutional right. Justice Stevens did not assert that the judiciary should closely scrutinize government laws regulating how many people could be on a sidewalk or the conditions on which people could walk down sidewalks in public places. Rather, the Stevens opinion, and the concurring Justices, merely found that the government could not make some form of human activity criminal without providing minimally adequate notice to individuals concerning the type of activity that would violate the law. Just as every law must survive the minimal rationality test, every criminal law must provide some notice to individuals concerning the conduct it makes criminal and provide some limitation of police discretion.

2 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* § 15.5, at 52 (3d ed. Supp. 2004).

Supreme Court's mandating that a right to loiter in *all* places deemed "public" is a fundamental liberty interest. Substantive due process analysis is context-specific; this statement hardly includes all the contexts of "public" places—for example, parks, public schools, jails, libraries, governmental administration buildings—nor does it mandate a fundamental liberty interest to loiter in all of them.

We also are unpersuaded by Mr. Doe's reliance on cases involving the First Amendment public forum doctrine, which holds that "the rights of the state to limit *expressive activity* are sharply circumscribed" in "quintessential public forums" such as "streets and parks." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (emphasis added). As we have discussed at some length in an earlier section of this opinion, Mr. Doe's conduct on the January 2000 night in question does not involve expression, and Mr. Doe's stated reasons for now wanting to enter the park are unrelated to expression. *See* Doe Aff. ¶ 7. Indeed, it is telling that Mr. Doe does not even mention the public forum line of cases in his First Amendment argument.

In sum, assuming the record would support his contention that he is seeking a right to enter public parks simply to wander and loiter innocently, we cannot characterize that right as "fundamental."

**2.**

Because we have concluded that the City's ban does not encroach on a fundamental liberty interest, we are bound to apply the rational basis standard of review to the City's ban. Accordingly, we must ask whether the ban is "rationally related to a legitimate government interest, or alternatively phrased," whether the ban is "arbitrary" or "irrational." *Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003). As Mr.

Doe concedes, the City's interest is not merely legitimate, it is compelling. *See* Appellant's Br. at 20; *see also New York v. Ferber*, 458 U.S. 747, 756-57 (1982) ("It is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'" (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607 (1982))). Furthermore, the ban of Mr. Doe from the City's parks is rationally related to that end. Mr. Doe admits that he is a sexual addict who always will have inappropriate urges toward children; his physician readily concedes that sexual addicts like Mr. Doe sometimes fall down the slippery slope into abuse; and, in January of 2000, he started down the slippery slope when he went to the parks in response to those urges and did not act on them only because they were not "realistic" at the time. Add these facts to the reality that children, some of the most vulnerable members of society, are susceptible to abuse in parks, and it is hard to see how the City's ban is anything but rational.

Indeed, even if we were required to judge the ban under the strict scrutiny standard, we would uphold its validity. Strict scrutiny mandates that the governmental regulation at issue have a compelling government interest and be narrowly tailored to serve that interest. *See Billings v. Madison Metro. Sch. Dist.*, 259 F.3d 807, 815 (7th Cir. 2001). Again, Mr. Doe concedes the compelling nature of the City's interest in protecting its youth; therefore, the only question is whether the ban is narrowly tailored to serve that interest. The narrow tailoring inquiry requires that we ask whether there are "other, reasonable ways to achieve th[e] goals with a lesser burden on constitutionally protected activity." *Johnson*, 310 F.3d at 503 (quoting *Dunn v. Blumstein*, 405 U.S. 330, 343 (1972)). If there are, the City "may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.'" *Id.*

The City has banned only one child sex offender, Mr. Doe, from the parks, and they have banned Mr. Doe only because of his near-relapse in January of 2000 when he went into the park to engage in psychiatric brinkmanship.[14] Mr. Doe argues that the ban could be narrower both geographically—limited to certain areas of the park system— and temporally—it could extend for a finite period of time. This argument ignores that the only "less drastic means" the City must conform to are those which are "reasonable" means of achieving the compelling interest. *Id.* The City cannot reasonably anticipate what parts of the park system children will be located in at all times, and, on this record, we have no basis on which to question its judgment that children are vulnerable throughout the park system. As to the temporal nature of the ban, Mr. Doe concedes that his sexual urges toward children *always* will be with him, and his behavior in January of 2000, coupled with his criminal history, presents a compelling case that he is prone to relapse. Nothing in the record suggests this is likely to subside over time. Accordingly, even assuming that we ought to consider this ban under the strict scrutiny standard, we still would hold it was valid as the narrowest *reasonable* means for the City to advance its compelling interest of protecting its children from the demonstrable threat of sexual abuse by Mr. Doe.

---

[14] Mr. Doe suggests that his exclusion is irrational because there are many convicted sex offenders living in the same geographic area who are not banned from the parks. According to this record, however, the City does not have knowledge that relapses or near-relapses involving other sex offenders have occurred on city property. There is certainly nothing in the record to suggest the City would act differently when faced with a similar case.

## Conclusion

For the foregoing reasons, we must reject Mr. Doe's challenges based on the First and Fourteenth Amendments and affirm the judgment of the district court.

AFFIRMED

WILLIAMS, *Circuit Judge*, with whom ROVNER and DIANE P. WOOD, *Circuit Judges*, join in dissenting. John Doe was banned for life from all park property in the City of Lafayette, Indiana—including a golf course, sports stadium, and city pools. As this ban violates Doe's First Amendment right to freedom of thought by impermissibly punishing him for those thoughts, I respectfully dissent.

## I. BACKGROUND

Convicted sex offenders, particularly child molesters, are a reviled group. Child molestation is one of the most heinous and deplorable crimes, attacking our most precious resource, our children. John Doe is a member of this understandably vilified group. His criminal history includes convictions for child molestation, voyeurism, exhibitionism, and window peeping. His last conviction was in 1991, ten years before this litigation. Doe's crimes were committed in schools, a convenience store, and outside private residences (though none in a park). He admits that his urges are triggered by emotional vulnerability, typically in the late

evening. As a result of these criminal convictions, Doe has been hospitalized, imprisoned, under house arrest, and on probation. He has been in active psychological treatment since 1986, and voluntarily attends group therapy. Doe admits he still has fantasies about children, and his psychologist opines that he will likely have these urges for the rest of his life.

In January 2000, Doe was driving home from work and stopped at Murdock Park, in the City of Lafayette,[1] and watched five youths in their early teens playing on a base-ball diamond. Doe admits that, while observing them, he thought about having sexual contact with the children. After watching them for 15-30 minutes, and without having any contact with them, Doe left the park. "I said to myself: I've got to get out of here before I do something, so I left." Doe Dep. at 27.[2]

Once Doe left the park, he sent an emergency page to his psychologist's answering service, which immediately con-tacted the doctor. Doe explained what occurred and ex-

---

[1] The majority points out that Doe came in contact with two parks, but his intention in going to the first park, Columbian Park, is far from clear. Doe explained in his deposition that he lived a short distance from that park, and there is no evidence that he got out of his car or even stopped his car at the first park.

[2] Characterizing Doe's ability to control his urges as "marginal," the majority seems to focus on Doe's statements concerning the logistical difficulty of approaching the teenagers on the baseball diamond. Majority opinion at 9. However, as the majority concedes and Doe articulates, he was able to control himself and leave the park. "While watching the children in Murdock Park in January of 2000 I certainly had sexual thoughts. However, I was not planning to act on my thoughts. I recognized that these were just unhealthy thoughts and I realized I needed to leave the park, which is what I did." Doe Aff. ¶ 5.

pressed that he was upset about the incident. As part of his treatment, his psychologist suggested that he discuss the incident with his sexual addicts anonymous (SAA) group, which was to meet a few days later. The doctor also focused on the fact that Doe was able to control his urge and leave the park as a positive step in his rehabilitation.[3] As the longest non-offending member of the SAA group, its members were very disappointed by Doe's disclosure. In response to this incident, Doe began voluntarily receiving weekly shots of Depo-Provera to aid in suppressing his urges.

An anonymous source reported Doe's January visit to the park, and the thoughts he had while he was there, to Doe's former probation officer. The probation officer then contacted the Lafayette Police Department, which prompted a conversation between the Police Chief, the Superintendent of the Lafayette Parks Department, and a City attorney regarding Doe's appearance in the park. Their discussion focused on the nature of Doe's January visit to the park and his criminal history, although all acknowledge that Doe was no longer serving a sentence or on probation.[4] As a result of this conversation, the City Parks Department issued an order

---

[3] Doe's psychologist explained that "[i]n the first phase of recovery, our primary goal is to keep the patient as far away from any circumstance that might hold a trigger for him." While, "[i]n the second phase of recovery, we actually encourage the patient to begin to determine the boundaries of what's safe and what's not safe." Moisan-Thomas Dep. at 14-15.

[4] Doe was not on probation in January 2000 and was not even restricted from entering the park during his period of house arrest a decade earlier, thus, this analysis will not consider whether the restrictions imposed by the City might have been appropriate as a condition of release as part of the earlier criminal sentences. *Cf. United States v. Schave*, 186 F.3d 839, 841 (7th Cir. 1999).

permanently banning Doe from entering any City park property at any time and for any purpose under threat of arrest for trespass. The City did not provide any pre-issuance review of the ban, nor was Doe afforded an opportunity to appeal.[5]

The ban order is both geographically and temporally broad. The City of Lafayette's extensive park system includes several large parks, many smaller neighborhood parks, a zoo, a golf course, a sports complex, a baseball stadium, and several pools. Typically, ban orders are issued by the City against those who have vandalized park property or interfered with park patrons. The resulting bans ordinarily are issued for a week or, at most, a summer. In this case, the ban order against Doe has no termination date.[6]

## II. ANALYSIS

Doe's First Amendment appeal raises several questions not typically before a court. May a city constitutionally ban one of its citizens from public property based on its discovery of that individual's immoral thoughts? Is being banned from public property a "punishment"? Does the First Amendment protect a citizen's right to think about committing a crime, even if he has committed that crime in the past? This scenario is quite unusual, as it is a rare case where thoughts, as distinct from deeds, become publicly

---

[5] Although I have grave concerns about the procedural due process infirmities in the method employed by the City to issue the ban, Doe does not challenge the order on this ground. I continue to be intrigued by Doe's strategic decision to forgo this straightforward claim.

[6] As the majority points out, Doe also has not challenged the ban on the grounds that it is unconstitutionally overbroad. I am also puzzled by the omission of this issue from Doe's discussion.

known. Most thinking, unless purposefully revealed to others, remains one's own. Unlike other cases in which the state becomes aware of an individual's mental state because of his or her actions, here the City acknowledges that Doe's own revelation of his thoughts, not any outward expression demonstrating his thinking, is the basis for its actions.

### A.  The First Amendment prohibits government control over a citizen's thoughts.

The freedom of individuals to control their own thoughts has been repeatedly acknowledged by the Supreme Court. In *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943), the Court upheld a challenge by Jehovah's Witnesses to West Virginia's requirement that all schoolchildren participate in a pledge and salute honoring the United States flag. The Court ruled that such an obligation would impermissibly infringe upon "the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Id.*

Although Barnette's challenge to the West Virginia enactment was based on religious conviction, *id.*, the guarantee of freedom of the intellect has not been limited to beliefs concerning politics or religion. In *Stanley v. Georgia*, 394 U.S. 557 (1969), Stanley was convicted under Georgia law for possessing obscene material when pornographic films were found in his home. The Supreme Court reversed Stanley's conviction, finding a right to peruse obscene material in the privacy of one's home. *Id.* at 565-66. A central focus of the Court's discussion was the quintessential principle that the government's power does not extend to control of a person's thoughts: "a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch. Our whole constitutional heritage

rebels at the thought of giving government the power to control men's minds." *Id.* at 565. Once again, the Court tied this freedom to fundamental principles of the First Amendment, holding that "it is wholly inconsistent with the philosophy of the First Amendment" for the government to exercise "the right to control the moral content of a person's thoughts." *Id.* at 565-66.[7]

The Court has also recognized the intersection of freedom of the mind, protected by the First Amendment, with the right to privacy. *See Griswold*, 381 U.S. at 483 ("[T]he First Amendment has a penumbra where privacy is protected from governmental intrusion."); *see also Lawrence v. Texas*, 539 U.S. 558, 558 (2003) ("Liberty protects the person from unwarranted government intrusions into a dwelling or other private places. In our tradition the State is not omnipresent

---

[7] *See also United States v. Reidel*, 402 U.S. 351, 355-56 (1971) (affirming that *Stanley* focused on the "freedom of mind and thought and on the privacy of one's home"); *Wooley v. Maynard*, 430 U.S. 705, 714-15 (1977) (overturning requirement that license plate include phrase "Live Free or Die" under "the proposition that the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all"); *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965) ("The right of freedom of speech and press includes . . . freedom of thought"); *United States v. Schwimmer*, 279 U.S. 644, 654-55 (1929) (Holmes, J., dissenting) ("[I]f there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought"); Steven J. Heyman, *Spheres of Autonomy: Reforming the Content Neutrality Doctrine in First Amendment Jurisprudence*, 10 Wm. & Mary Bill Rts. J. 647, 655 (2002) ("Although the First Amendment does not expressly mention freedom of thought, it is generally agreed that this freedom lies at the heart of what the amendment was intended to protect.").

in the home. And there are other spheres of our lives and existence, outside the home, where the State should not be a dominant presence. Freedom extends beyond spatial bounds. Liberty presumes an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct."); Claudia Tuchman, *Does Privacy Have Four Walls? Salvaging Stanley v. Georgia*, 94 Colum. L. Rev. 2267, 2282 (1994) (discussing freedom of thought and reasoning that "[f]reedom of mind focuses on the privacy of all personal thoughts—the 'abnormal' as well as the intellectually worthy.").

Indeed, even when an individual's ideas concern immoral thoughts about child pornography, the Court has steadfastly maintained the right to think freely. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 252-53 (2002). In *Free Speech Coalition*, the Court considered federal legislation that criminalized virtual child pornography, so named because although the images appear to depict minors, they were produced without using real children. *Id.* at 239. The Court struck down the ban, finding that Congress could not justify prohibition of the constitutionally-protected speech. *Id.* at 256. There, the fact that possession of virtual child pornography may ignite sexually immoral thoughts about children was not enough to justify banning it. *Id.* at 252-53. Given the Court's long-standing recognition of the freedom of thought, the City of Lafayette's ban order must be analyzed in light of the principle that freedom of the mind occupies a highly-protected position in our constitutional heritage.

The City defends the ban as a measure to protect its youth from a person with a history of sex offenses whom it fears may harm its children in the future. As part of this argument, the City and the majority seem to equate a propensity to commit crime with an inability to control one's impulses, implying that Doe's thoughts about children and close prox-

imity to them will lead him to strike again. First, propensity and volitional capacity are distinct aspects of conduct. *See Kansas v. Crane*, 534 U.S. 407, 414 (2002) (recognizing that the Constitution does not permit the commitment of a pedophile without some lack-of-control determination thereby recognizing the possibility that a pedophile may control his urges). Further, this fear—that an individual's thoughts may encourage action—is not enough to curb protected thinking.

The Court in *Stanley* addressed the line between crime prevention and protected speech, stating,

> we believe that in the context of private consumption of ideas and information we should adhere to the view that '[a]mong free men, the deterrents ordinarily to be applied to prevent crime are education and *punishment for violations of the law*.'

394 U.S. at 566-67 (emphasis added).

Further, in *Free Speech Coalition*, the government proposed a similar theory in defense of the ban of virtual child pornography. 535 U.S. at 253. Attempting to prevent the potential indirect harm to children posed by pedophiles, Congress reasoned that the virtual pictures may serve to "whet" the appetites of pedophiles and may be used to convince a reluctant child to participate in sexual acts. *Id.* at 241. In line with its previous stance in *Stanley*, the Court squarely rejected this theory: "The government 'cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts.' First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end." *Id.* (quoting *Stanley*, 394 U.S. at 566). Citing criminal statutes 18 U.S.C. §§ 2241 and 2251, which prohibit sexual abuse, the Court reasoned that "Congress may pass valid laws to protect children from abuse," however, "[t]he *prospect of*

*crime . . .* by itself does not justify laws suppressing pro-
tected speech." *Id.* at 245 (emphasis added).

The majority aptly points out that while pure thoughts are
protected by the First Amendment, non-expressive actions
are not. First Amendment jurisprudence is fastened upon
the critical distinction between thinking and acting on those
thoughts. *See, e.g., Free Speech Coalition,* 535 U.S. at 253
("[T]he Court's First Amendment cases draw vital distinc-
tions between words and deeds, between ideas and con-
duct."); *Reidel,* 402 U.S. at 356 (private thoughts or fantasies
are protected by the First Amendment, but selling or buying
obscenity in the mail is not protected activity and may be
proscribed without violating the First Amendment). The
majority argues that Doe's steps of driving to the park and
watching children constitute non-expressive conduct. The
question then is whether the First Amendment protects a
citizen who goes to a venue and thinks about committing a
crime? It is clear on this record, that absent Doe's thoughts
(and arguably his status as a pedophile, which I address
below) the City would be uninterested in Doe's decision to
go to the park that fateful day. Moreover, divorcing Doe's
thoughts from the City's decision to ban him also strips the
City of its alleged "rational basis" for its decision.

Recognizing that no child was directly harmed by Doe's
decision to go to the park, the issue here, like that in *Free
Speech Coalition,* is the scope of the City's power to curb
protected thought under the First Amendment to prevent
criminal conduct. In the context of child pornography and
the potential for child abuse, *New York v. Ferber,* 458 U.S.
747, 759-60 (1982) and *Osborne v. Ohio,* 495 U.S. 103, 110-11
(1990), reflect the delineation between prohibiting conduct
which actually harms children by making them victims and
conduct which facilitates criminal conduct. For example, in
*Ferber,* the Court upheld the prohibition of the distribution

and sale of child pornography, even though it did not meet the definition of obscenity under *Miller v. California*, 413 U.S. 15 (1973), because of the actual harm suffered by participants in the making of the child pornography. 458 U.S. at 759-60. Further explaining this distinction, the Court in *Osborne* allowed the prohibition of purely private possession of child pornography based on the fact that it helps facilitate criminal conduct, such as its use in soliciting minors to participate in sexual acts or whetting the appetites of pedophiles. 495 U.S. at 110-11. However, the Court also reasoned that the actual harm suffered by participants was a key ingredient to the constitutionality of the prohibition. *Id.* Finally, in *Free Speech Coalition*, the Court reaffirmed the importance of this actual harm element by reasoning that the First Amendment is violated when speech which "records no crime and creates no victims by its production" is prohibited. 535 U.S. at 250.[8]

---

[8] The Court's holding in *Free Speech Coalition* directly rejects the majority's puzzling attempt to carve out categories of thought that should be "unprotected" because they might relate to obscenity or may "incite" unlawful action. Thought is protected regardless of its underlying content. *See Reidel*, 402 U.S. at 356 ("[Reidel] has no complaints about governmental violations of his private thoughts or fantasies, but stands squarely on a claimed First Amendment right to do business in obscenity. . ."). Furthermore, the majority's reliance on *Brandenburg v. Ohio*, 395 U.S. 444 (1969), for the proposition that Doe's thoughts are a form of self-incitement is equally puzzling. The cases that have referred to *Brandenburg* have all involved the incitement, or the attempted incitement to lawlessness of one group or individual by a different group or individual. *See e.g. Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001); *Texas v. Johnson*, 491 U.S. 397 (1989); *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982); *Communist Party of Indiana v. Whitcomb*, 414 U.S. 441 (1974); *Eisenstadt v. Baird*, 405 U.S. 438 (1972).

The City did not receive any complaints from the children in the park, and it does not allege that anyone was affected by Doe's presence there. Presumably, untold numbers of Lafayette residents wander the City's parks every day, many of them potentially thinking offensive or objectionable thoughts. The City has not suggested that it monitors sex offenders' presence in the City parks, and it could not cite any other example of an individual banned for mere presence in the park. The only factors that differentiate Doe from others are that the City was apprised of his thoughts while he was in the park and its knowledge of his past conduct.

The majority's reliance on cases such as *United States v. O'Brien*, 391 U.S. 367, 376 (1968) and *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986) is unhelpful. These cases focus on the distinction between mere conduct and expression and do not contradict long-standing principles regarding protection of thought. *Cf. Free Speech Coalition*, 535 U.S. at 253 ("The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought."). Furthermore, the ban is not a content-neutral widely applied general ordinance, which incidentally affects a narrow form of expressive conduct, as was the case in *O'Brien* and *Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984). Rather, the City seeks to prohibit Doe from entering its park facilities based on his thoughts, which, as stated above, are the bedrock of expression. Finally, this situation is distinguishable from *Arcara*. In *Arcara*, the Court found that the First Amendment did not preclude the closing of a bookstore when it was undisputed that solicitation of prostitution and other sexual acts were being performed by patrons in the store. *See id.* at 705 ("[W]e underscored the fallacy of seeking to use the First Amendment as a cloak for obviously unlawful public sexual

conduct. . .”). Therefore, he is not seeking to use the First Amendment to cloak unlawful conduct as no such unlawful conduct occurred.

## B.   The ban imposed on Doe is a punishment.

The majority characterizes the ban as a form of “civil exclusion,” majority opinion at n. 8, and brushes aside the argument that the ban is punitive in nature. However, it is clear from the record that the City seeks to punish Doe by banning him from public park facilities based on the City’s discovery of his fantasies.

When determining whether a governmental action constitutes a punishment, courts review such factors as:

> [W]hether a sanction involves an affirmative restraint, how history has regarded it, whether it applies to behavior already a crime, the need for a finding of scienter, its relationship to a traditional aim of punishment, the presence of a nonpunitive alternative purpose, and whether it is excessive in relation to that purpose.

*Kansas v. Hendricks*, 521 U.S. 346, 394 (1997) (Breyer, J. dissenting) (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 169 (1963)) (finding that Kansas’s involuntary commitment of a mentally ill sexually dangerous offender is a civil rather than criminal sanction). Courts may also look to the State’s articulated purpose behind the measure. *See Smith v. Doe*, 538 U.S. 84, 93 (2003) (characterizing the forced registration of sex offenders with the Department of Corrections as a civil sanction). For example, in *In the Matter of Ruffalo*, 390 U.S. 544, 550 (1968), the Court found that “[d]isbarment, designed to protect the public, is a punishment or penalty imposed on the lawyer.” Similarly, in *Specht v. Patterson*, 386 U.S. 605, 608-09 (1967), the Court found that Colorado’s Sex Offender’s Act served to punish, “even though it is de-

signed not so much as retribution as it is to keep individuals from inflicting future harm." Both cases focus on the importance of fair notice and due process.

This ban unquestionably imposes an affirmative restraint on Doe's liberty of movement. *See Youngberg v. Romeo*, 457 U.S. 307, 316 (1982) (discussing the "freedom of movement" and citing *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 18 (1979), for the proposition that "[l]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action."). In its attempt to characterize the City's action as "nonpunitive," the majority cites *Smith* for the proposition that the Constitution permits the "imposition of restrictive measures on sex offenders adjudged to be dangerous." 538 U.S. at 93. Majority opinion at n.8. However, this quote fails to tell the full story. The Court went on to affirm the constitutionality of Alaska's sex offender registry because it "does not restrain activities sex offenders may pursue," *id.* at 100, and the "dissemination of truthful information in furtherance of a legitimate governmental objective" is not punishment, *id.* at 98. In contrast, Lafayette's ban expressly prohibits Doe from entering any property deemed a part of the Lafayette Park system, which encompasses far more than its parks. Far from merely giving the public truthful information, this ban affirmatively restricts Doe's freedom of movement. The City's action is reminiscent of a partial banishment, which serves to expel Doe from certain portions of City property, *see id.* at 98 (discussing banishment as a measure historically recognized as a punishment), and therefore is not akin to a duty to register.

Perhaps most telling is the ban's relationship to the traditional aims of punishment. *See* Stephen B. Reed, *The Demise of Ozzie and Harriet: Effective Punishment of Domestic Abusers*, 17 New Eng. J. on Crim. & Civ. Confinement 337,

358-63 (1991) (discussing the traditional aims of punishment as deterrence, incapacitation, retribution, and rehabilitation). Specifically, the ban serves the twin goals of deterrence, which are to prevent an individual from repeating conduct as well as preventing similar acts by others. *See id.* at 358-59. News of Doe's ban will surely serve to warn others in his position that they too may be restricted from entering portions of Lafayette if the City is apprised of their immoral thoughts. (The ban also serves to deter sex offenders from seeking treatment, but I will address that issue later.)

Further, the ban segregates Doe from the community and sets him apart from the general population. This form of segregation is similar to a condition of probation or supervised release. *See Smith*, 538 U.S. at 101 ("Probation and supervised release entail a series of mandatory conditions and allow the supervising officer to seek the revocation of probation or release in case of infraction."); *Schave*, 186 F.3d at 841 (preventing a convicted explosives dealer from "associating with organizations that, or members who, espouse violence or the supremacy of the white race"). Here, the City has set out a mandatory restriction and should Doe set foot in a City park facility he may be prosecuted for trespass. *See United States v. Holm*, 326 F.3d 872, 878 (2003) ("to the extent that the condition [of supervised release] is intended to be a total ban on Internet use, it sweeps more broadly and imposes *a greater deprivation on Holm's liberty* than is necessary. . .") (emphasis added).

The ban is also excessive in relation to its stated purpose as it contains no termination date. Critical to the analysis in *Hendricks*, was the Court's determination that the petitioner would be confined only so long as he remained a danger to himself or to the public. 521 U.S. at 363. The Court also noted that the duration of confinement was only "potentially" indefinite. *Id.* We have no such safeguards here. Doe

has been banned for life, with no prospect of review or reconsideration by the City.

I recognize that Doe is not challenging the ban on procedural grounds, *see* n. 5, *infra*, however, the utter lack of pre-application procedure and post-application review is critical to the question of whether the ban is punitive. Both *Hendricks* and *Smith* relied on the imposition of sanctions *after* constitutionally appropriate procedures to protect against potential arbitrary government action. *See Hendricks*, 521 U.S. at 357 ("We have consistently upheld such involuntary commitment statutes provided the confinement takes place pursuant to proper procedures and evidentiary standards."); *Smith*, 538 U.S. at 84 (registration only mandated for those previously convicted of a sexual offense). One could argue that these cases are inapposite based on this difference alone. The lack of such procedural safeguards, i.e., periodic review of the necessity of the ban, any procedure to test the accuracy of the information used by the City as its basis for action, and the lack of any connection to Doe's ability to control his urges, serves to highlight the City's actual motivation.

Finally, the fact that the anonymous caller contacted Doe's former probation officer, who then in turn contacted the police department (criminal units) who then contacted the superintendent of parks and the city attorney further underscores the City's intention to punish rather than civilly sanction. The resulting ban order is a judicially enforceable criminal decree which punished Doe for his thoughts. *See Hill v. Colorado*, 530 U.S. 703, 713 (2000) (quoting *Madsen v. Women's Health Center*, 512 U.S. 735, 764 (1994) (reasoning that a judicial decree poses a "greater risk of censorship and discriminatory application than do general ordinances.")).

Having found that the ban is in fact punitive, the maxim *cogitationis poenam nemo patitur* (no one is punishable solely

for his thoughts) is particularly apt. This maxim serves as a cornerstone of the criminal justice system and has shaped many of the constitutional boundaries of criminal law.[9] Perhaps the Victorian legal scholar James Fitzjames Stephen best explained this basic limit on government power: "If it were not so restricted it would be utterly intolerable; all mankind would be criminals, and most of their lives would be passed trying and punishing each other for offenses which could never be proved." 1 James Fitzjames Stephen, A History of the Criminal Law of England 78 (1883).

## C.  A citizen may not be punished based on his status.

My conclusion is buttressed by a fundamental understanding of the bounds of punishable conduct. This axiomatic principle is illustrated by the distinction between punishment for a person's status—impermissible under the Eighth Amendment—and sanctions levied for a person's conduct. *See Robinson v. California*, 370 U.S. 660, 666 (1962). In *Robinson*, the Supreme Court struck down a California statute that made addiction to narcotics illegal. *Id.* at 666-67. Because the statute required no illegal act, but criminalized mere status as a drug addict, it violated the Eighth Amendment's prohibition against cruel and unusual punishment. *Id.* at 667.

---

[9] The proscription against penalizing for ideas alone has been recognized for centuries, *see* 4 William Blackstone, Commentaries on Laws of England, 21 (1765) ("[N]o temporal tribunal can search the heart or fathom the intentions of the mind, otherwise than as they are demonstrated by outward actions, it therefore cannot punish for what it cannot know."), and is reflected in modern codifications of the common law, *see* Model Penal Code and Commentaries, Comment to § 2.01 at 214-15 (1985) ("It is fundamental that a civilized society does not punish for thoughts alone.").

This distinction was further refined in *Powell v. Texas*, 392 U.S. 514, 532-34 (1968), where the Court explained that although status may not be criminalized, acts undertaken as a result of that status may be. There, the Court upheld Powell's arrest for appearing drunk in public because the Texas law did not sanction Powell merely for his status as an alcoholic, but for his act of overimbibing in public. *Id.* at 535-36. The Court rested its holding on the fact that Powell voluntarily committed sanctionable conduct: "The entire thrust of *Robinson's* interpretation of the Cruel and Unusual Punishment Clause is that criminal penalties may be inflicted only if the accused has committed some act, has engaged in some behavior, which society has an interest in preventing, or perhaps in historical common law terms, has committed some *actus reus*." *Id.* at 533. *See also United States v. Black*, 116 F.3d 198, 200-01 (7th Cir. 1997) (conviction for distribution, receipt, and possession of child pornography did not violate the Eighth Amendment despite plaintiff's contention of his status as a pedophile).

Doe's going to the park does not rise to the level of an "action" of sufficient gravity to justify punishment. The error in punishing actions similar to Doe's is more easily seen by way of analogies removed from the sensitive context of child molestation. By way of comparison, courts would not sanction criminal punishment of an individual with a criminal history of bank robbery (a crime, like child molestation, with a high rate of recidivism, *United States v. Pirovolos*, 844 F.2d 415, 416 n.1 (7th Cir. 1988)) simply because she or he stood in the parking lot of a bank and thought about robbing it. It goes without saying that in this hypothetical the individual has not taken an action that could support punishment. Or, as a different example, punishing a drug addict who stands outside a dealer's house craving a hit but successfully resists the urge to enter and purchase drugs would be offensive to our understanding of the bounds of the

criminal law. *See Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 67-68 (1973) ("The fantasies of a drug addict are his own and beyond the reach of government, but government regulation of drug sales is not prohibited by the Constitution.") Despite the City's arguments to the contrary, both of these situations, analogous to the actions taken by Doe here, present clear examples of actions that do not reach a level of criminal culpability necessary to justify punishment.

As these illustrations suggest, Doe's behavior may also be understood as the kind that does not come close to what is recognized as punishable under the theory of attempt. Under Indiana law, a person commits attempt when, acting with culpability necessary to commit the crime, he or she "engages in conduct that constitutes a substantial step toward commission of the crime." Ind. Code § 35-41-5-1. Here, the most that can be said of Doe's action is that he drove to the park and watched children. Even if it is assumed that Doe intended to molest children when he stood in the park, Doe's mere presence in the park is not enough to constitute a "substantial step" towards an attempted sex offense. *See State v. Kemp*, 753 N.E. 2d 47, 51 (Ind. Ct. App. 2001) (affirming dismissal of attempted child molestation charge when defendant allegedly agreed to meet minor at restaurant parking lot, drove there, and brought condoms because conviction would result in "no limit on the reach of 'attempt' crimes"). In the same way that the individual with a history of robbing banks could not be charged with attempted bank robbery for standing across the street from the bank and thinking about robbing it, Doe may not be punished for merely thinking perverted thoughts about children.

Finally, Doe's conduct is not akin to stalking, which, while perhaps motivated by thoughts, requires actual threatening conduct by the stalker. Stalking statutes typically require that a defendant: (1) knowingly or intentionally; (2) engage

in a course of conduct involving continuous or repeated harassment; (3) that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened; and (4) actually causes that person to feel terrorized, frightened, intimidated, or threatened. *See*, *e.g.*, Ind. Code § 35-45-10-1. Doe's actions do not come close to criminal conduct punishable as stalking. He did not "continually" or "repeatedly" go to the public park; his ban order was based on a single visit. *See Landis v. State*, 704 N.E.2d 113, 113 (Ind. 1998) (holding that "the crime of stalking by its nature necessitates proof of repeated or continuing acts"). Nor did Doe's gaze or proximity cause any specific person to feel frightened or threatened; indeed, there is no evidence that anyone even *noticed* Doe's presence. *Frazier v. Delco Elecs. Corp.*, 263 F.3d 663, 668 (7th Cir. 2001) ("The stalking victim who doesn't know that she is being stalked is not in fear of being injured."). Most importantly, Doe's conduct—going to a public park with improper thoughts about children previously unknown to him—did not harm any of the youths in the park, unlike the terror caused by actions criminalized as stalking.[10]

---

[10] *See*, *e.g.*, *Garza v. State*, 736 N.E.2d 323, 325 (Ind. Ct. App. 2000) (despite several requests to be left alone, stalker repeatedly contacted victim, sent her flowers with a message that began "hate, anger, bitterness, malice, venom, hellish prisons of our own making," and joined her health club); *Johnson v. State*, 721 N.E.2d 327, 330 (Ind. Ct. App. 2000) (stalker threatened to kill former girlfriend, flattened her car tires, and came to her home on many occasions, including three separate times the night he was arrested); *Waldon v. State*, 684 N.E.2d 206, 207 (Ind. Ct. App. 1997) (despite existence of restraining order, victim encountered stalker on at least six separate occasions near her dance studio within one-year period).

### III. CONCLUSION

In the City's haste to take action to protect its children, an admirable goal, both the majority and the City fail to apprehend the possible secondary effects of this ban on the very safety it seeks to ensure. As a society grappling with the problem of pedophilia, *see Crane*, 534 U.S. at 414 (requiring some lack-of-control determination in the civil commitment of convicted pedophile), we have limited resources in our arsenal to address the possibility that someone like Doe may reoffend. Once released back into our society, a former sex offender must feel free to seek therapy and must be supported in his efforts to control his urges rather than penalized. Why deter former sex offenders from one of the few treatments available? The importance of therapy cannot be understated. *See* 51 Am. Jur. 3d § 5 ("the group (led by the therapist) works on each member's issues, such as denial, guilt, the offender's own sexual trauma, or lack of empathy for the victim. This is a common technique for outpatient treatment of sex offenders (often a condition of probation). . ."). The First Amendment's concern with freedom of thought as a basis for the freedom of expression is highlighted by the facts of this case. The chilling effect of this ruling, i.e., that the communication of one's thoughts may result in being banned from public spaces, is frightening. *See Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004) ("The Supreme Court has often noted that a realistic threat of arrest is enough to chill First Amendment rights."). To oversimplify the issue, as one of location or logistics (i.e., the argument that Doe can simply think elsewhere) fails to address the problem of chilled speech, or here thought, that the First Amendment seeks to secure.

One cannot be a thinking member of society and not be acutely aware of the critical problem of sex offenses against children. The substance of Doe's sexual fantasies about

children are repugnant and deplorable. Doe himself admits that. But, of course, the fact that this court or the City of Lafayette finds Doe's thoughts offensive does not limit the amount of First Amendment protection they are afforded. *See Free Speech Coalition*, 535 U.S. at 245 ("It is also well established that speech may not be prohibited because it concerns subjects offending our sensibilities."); *Am. Booksellers Assoc. v. Hudnut*, 771 F.2d 323, 327 (7th Cir. 1985) ("Under the First Amendment the government must leave to the people the evaluation of ideas."); *Collin v. Smith*, 578 F.2d 1197, 1200 (7th Cir. 1978) (noting that the First Amendment covers protected speech even though it may be "repugnant to the core values held generally by residents of this country"). Despite our repudiation of the content of his thoughts, the City of Lafayette may not punish Doe for his thinking alone, for without protection from government intrusion into our thoughts, the freedoms guaranteed by the First Amendment are virtually meaningless.[11]

---

[11] The majority also addresses Doe's argument that the ban order violates a constitutionally-protected freedom to loiter. *Cf. City of Chicago v. Morales*, 527 U.S. 41, 53 (1999) (plurality opinion) (remarking that the freedom to loiter for innocent purposes is protected by the Due Process Clause of the Fourteenth Amendment). As I find the ban order violative of Doe's First Amendment right to freedom of thought, I find it unnecessary to reach this issue and express no view on the question.

No. 01-3624                                            53

A true Copy:

     Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*