2015 IL App (1st) 132221

FOURTH DIVISION
December 24, 2015

No. 1-13-2221

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 3504 |
| | ) | |
| OSIRIS AVILA-BRIONES, | ) | Honorable |
| | ) | Noreen Valeria-Love, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices Howse and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1 In this appeal, defendant Osiris Avila-Briones, who was convicted of aggravated criminal sexual abuse for having sex with a 16-year-old girl when he was 23 years old, asks us to revisit the constitutionality of the Sex Offender Registration Act (SORA) (730 ILCS 150/1 *et seq.* (West 2012)), the Sex Offender Community Notification Law (Notification Law) (730 ILCS 152/101 *et seq.* (West 2012)), and other statutes applicable to sex offenders (collectively, the "Statutory Scheme"). Defendant acknowledges that previous versions of these laws have been upheld but claims that the current versions of these laws are very different than the versions at issue in prior case law. He alleges that the Statutory Scheme has become so onerous that it has crossed the threshold from a civil regulatory scheme to a system of punishment. And, according to defendant, that system of punishment violates the constitutional prohibitions on cruel and unusual punishment, as well as his rights to procedural and substantive due process.

¶ 2 We need not revisit whether the Statutory Scheme constitutes punishment or not because, even assuming that it did, it would not violate the eighth amendment or proportionate penalties

clause. A lifetime of restrictions similar to parole or probation is not a grossly disproportionate sentence for defendant's offense, and the Statutory Scheme serves legitimate penological goals. We also disagree with defendant's contention that the Statutory Scheme violates substantive due process. It does not affect fundamental rights enshrined in the substantive due process clause and is rationally related to the goal of protecting the public from the possibility that sex offenders will commit new crimes. Finally, we reject defendant's procedural due process claim because defendant is not entitled to additional procedures to evaluate his risk of reoffending where his risk of reoffending is irrelevant to his status as a sex offender under Illinois law.

¶ 3                                    I. BACKGROUND

¶ 4      As defendant does not challenge the sufficiency of the evidence against him or any of the trial proceedings, we will discuss the facts of the case only to the extent necessary to understand defendant's constitutional challenges.

¶ 5      In May 2011, defendant, who was 23 years old at the time, began to have a relationship with M.H., a 16-year-old girl. Between July 2011 and early November 2011, defendant and M.H. had vaginal intercourse between 10 and 20 times. On November 17, 2011, the police were called to M.H.'s family's house, where defendant and M.H. were fighting. M.H. went to the hospital, where she learned she was pregnant. Defendant was arrested, and a police officer testified that defendant admitted to having sex with M.H. after he learned that she was underage. At trial, defendant testified that he did not know M.H. was 16 and that he never told the police that he had sex with her despite knowing she was underage.

¶ 6      After a bench trial, defendant was convicted of 10 counts of aggravated criminal sexual abuse. The trial court sentenced him to six years' incarceration, the minimum sentence available in light of defendant's previous convictions for burglary and possession of a stolen motor vehicle. See

730 ILCS 5/5-4.5-95(b) (West 2012) (requiring Class X sentencing range for offender convicted of three Class 2 or greater offenses). Defendant appeals.

¶ 7                                                     II. ANALYSIS

¶ 8                                  A. The Statutory Provisions at Issue

¶ 9     For clarity's sake, before turning to the parties' arguments, we will set out the various statutes that make up the Statutory Scheme. We have divided these statutes into three categories: (1) registration and notification requirements; (2) residency, employment, and presence restrictions; and (3) other provisions.

¶ 10                            1. Registration and Notification Requirements

¶ 11     Defendant's conviction for aggravated criminal sexual abuse qualifies him as a "sexual predator" under SORA. 730 ILCS 150/2(E)(1) (West 2012). As a sexual predator, defendant has a duty to register in person with the law enforcement agency in the municipality or county where he resides within three days of his release from prison. 730 ILCS 150/3(a), (c)(4) (West 2012). He will also have to register with the law enforcement agency in any municipality or county where he is temporarily domiciled for at least three days, and must provide that agency with his travel itinerary while there. 730 ILCS 150/3(a) (West 2012). If defendant works for or attends an institution of higher learning, he will have to register with, not only the police department in the jurisdiction where the school is located, but also "the public safety or security director of the institution of higher education." 730 ILCS 150/3(a)(2)(i), (ii) (West 2012).

¶ 12     Each time he registers, he must provide the authorities with a host of information about himself, including:

"[A] current photograph, current address, current place of employment, [his] telephone number, including cellular telephone number, [his] employer's telephone number, school

attended, all e-mail addresses, instant messaging identities, chat room identities, and other Internet communications identities that the sex offender plans to use, all Uniform Resource Locators (URLs) registered or used by the sex offender, all blogs and other Internet sites maintained by the sex offender or to which the sex offender has uploaded any content or posted any messages or information, extensions of the time period for registering as provided in this Article and, if an extension was granted, the reason why the extension was granted and the date the sex offender was notified of the extension. The information shall also include a copy of the terms and conditions of parole or release signed by the sex offender and given to the sex offender by his or her supervising officer [or aftercare specialist], the county of conviction, license plate numbers for every vehicle registered in the name of the sex offender, the age of the sex offender at the time of the commission of the offense, the age of the victim at the time of the commission of the offense, and any distinguishing marks located on the body of the sex offender." 730 ILCS 150/3(a) (West 2012).

He must provide proof of his address via "positive identification and documentation." 730 ILCS 150/3(c)(5) (West 2012). He will also have to pay a $100 fee every time he registers. 730 ILCS 150/3(c)(6) (West 2012).

¶ 13    Defendant will be required to re-register annually. 730 ILCS 150/6 (West 2012). But the law enforcement agency with which defendant is registered may require him to appear, on request, up to four more times per year. *Id.* If defendant lacks a fixed residence, he will be required to register on a weekly basis. *Id.* If any of the information that defendant previously provided changes, he will have to notify the last law enforcement agency he registered with, in person, within three days. 730 ILCS 150/3, 6 (West 2012).

¶ 14    Defendant will be required to comply with these provisions for the rest of his life. 730 ILCS 150/7 (West 2012). If defendant fails to comply with any of these requirements, he may be convicted of a Class 3 felony (730 ILCS 150/10(a) (West 2012)), carrying a sentence of up to five years' incarceration. 730 ILCS 5/5-4.5-40(a) (West 2012). Any subsequent failures to register are Class 2 felonies (730 ILCS 150/10(a) (West 2012)), which ordinarily have a sentencing range of 7 to 14 years' incarceration (730 ILCS 5/5-4.5-35(a) (West 2012)), but, because of defendant's prior convictions, will have a sentencing range of 6 to 30 years' incarceration. 730 ILCS 5/5-4.5-95(b) (West 2012). He will be required to pay a mandatory mininum $500 fine for each failure to register. 730 ILCS 150/10(a) (West 2012).

¶ 15    The Notification Law works in tandem with SORA. Under the Notification Law, law enforcement authorities must disclose sex offenders' names, addresses, dates of birth, places of employment, schools, email addresses, instant messaging identities, chat room identities, and "other Internet communications identities" to the following persons and entities in the county: institutions of higher education, public school boards, child care facilities, libraries, public housing agencies, the Illinois Department of Children and Family Services, social service agencies providing services to minors, volunteer organizations providing services to minors, and any victims of any sex offenses (not just the victim of the sex offense for which the sex offender has been convicted). 730 ILCS 152/120(a), (a-2), (a-3) (West 2012). The police must also inform these people and institutions of any uniform resource locators (URLs) "registered or used by the sex offender," blogs or Internet sites "maintained by the sex offender or to which the sex offender has uploaded any content or posted any messages or information." 730 ILCS 152/120(a-2) (West 2012). The police, "in [their] discretion," are also allowed to disclose this information "to any person likely to encounter a sex offender, or sexual predator." 730 ILCS 152/120(b) (West 2012).

For all other members of the public, this information must be made available on request. 730 ILCS 152/120(c) (West 2012).

¶ 16     The Illinois State Police must also maintain a website making sex offenders' registration information available to the public. 730 ILCS 152/115(b) (West 2012). Sex offenders must be searchable "via a mapping system which identifies registered sex offenders living within 5 miles of an identified address." *Id.*

¶ 17                    2. Residency, Employment, and Presence Restrictions

¶ 18     Moreover, defendant will be prohibited from living in certain areas based on his status as a child sex offender. He may not knowingly reside within 500 feet of a school that children under the age of 18 attend or within 500 feet of "a playground, child care institution, day care center, part day child care facility, day care home, group day care home, or a facility providing programs or services exclusively directed toward persons under 18 years of age." 720 ILCS 5/11-9.3(b-5), (b-10) (West 2012).

¶ 19     Defendant will also be restricted in his employment and other activities. He cannot work or volunteer at a day care or other "facility providing programs or services exclusively directed toward persons under the age of 18." 720 ILCS 5/11-9.3(c) (West 2012). He cannot "participate in a holiday event involving children under 18 years of age, including but not limited to distributing candy or other items to children on Halloween, wearing a Santa Claus costume on or preceding Christmas, being employed as a department store Santa Claus, or wearing an Easter Bunny costume on or preceding Easter." 720 ILCS 5/11-9.3(c-2) (West 2012). While he can participate in holiday activities with his own child "in the home," "other non-familial minors" may not be present at such a celebration. *Id.* He cannot work at, or "be associated with," any county fair when children are present. 720 ILCS 5/11-9.3(c-5) (West 2012). If he owns and lives in an apartment building, he

cannot rent out one of the units in the building to a parent of a child under the age of 18. 720 ILCS 5/11-9.3(c-6) (West 2012). He cannot drive an ambulance, fire truck, or other emergency vehicle. 720 ILCS 5/11-9.3(c-8) (West 2012). Nor can he drive an ice cream truck or other "vehicle which is specifically designed, constructed or modified and equipped to be used for the retail sale of food or beverages." *Id.*

¶ 20 If defendant violates any of the above restrictions on where he can live or work, he will have committed a Class 4 felony (720 ILCS 5/11-9.3(f) (West 2012)), which carries a sentencing range of three to six years' incarceration. 730 ILCS 5/5-4.5-45(a) (West 2012).

¶ 21 Other statutory provisions applicable to defendant by virtue of his conviction will penalize him for being near schools. Because defendant committed his offense against an individual under the age of 18, he is considered a "child sex offender" under sections 11-9.3 and 11-9.4-1 of the Criminal Code of 2012. 720 ILCS 5/11-9.3(d)(1)(i)(A), (d)(2)(ii), 11-9.4-1(a) (West 2012). As a child sex offender, he will be prohibited from knowingly being present in "any school building, on real property comprising any school, or in any conveyance owned, leased or contracted by a school to transport students to or from school or a school related activity" when children are present, unless he is attending a conference at a school concerning his own child. 720 ILCS 5/11-9.3(a) (West 2012). He cannot knowingly be present "within 100 feet of a site posted as a pick-up or discharge stop for a conveyance owned, leased, or contracted by a school to transport students to or from school or a school or school related activity" when children are present. 720 ILCS 5/11-9.3(a-5) (West 2012). If he violates these provisions, he will have committed a Class 4 felony. 720 ILCS 5/11-9.3(f) (West 2012).

¶ 22 Likewise, defendant cannot knowingly be present in any "public park" (720 ILCS 5/11-9.4-1(b) (West 2012))—defined as any "park, forest preserve, bikeway, trail, or conservation

area under the jurisdiction of the State or a unit of local government" (720 ILCS 5/11-9.4-1(a)(i) (West 2012))—or to loiter within 500 feet of any "public park." 720 ILCS 5/11-9.4-1(c) (West 2012). If he is present in or loitering near a public park, he will have committed a misdemeanor, and any future violations will be a Class 4 felony. 720 ILCS 5/11-9.4-1(d) (West 2012).

¶ 23                                  3. Other Provisions

¶ 24     Finally, defendant takes issue with two other provisions that do not fit in either of the above categories. First, he will be required to renew his driver's license annually. 730 ILCS 5/5-5-3(*o*) (West 2012). Second, he will be prohibited from changing his name. 735 ILCS 5/21-101 (West 2012).

¶ 25                                      B. Standing

¶ 26     Before reaching the substance of defendant's constitutional arguments, we must first address the State's claim that defendant lacks standing to challenge some of the above-described statutes. Specifically, the State contends that defendant cannot challenge the residency, employment, or presence restrictions, or the driver's-license and name-change provisions (described above in section I.A.2 and I.A.3), because those laws are independent of SORA and the Notification Law and they are "not applicable to [defendant]." Defendant contends that the injuries inflicted by these statutes—the restrictions on his behavior—are not hypothetical because he will be required to abide by them for the rest of his life, without exception, or face criminal prosecution.

¶ 27     In order to have standing to bring a constitutional challenge, a party must show that he is within the class aggrieved by the alleged constitutionality. *In re M.I.*, 2013 IL 113776, ¶ 32. And that "person must have suffered or be in immediate danger of suffering a direct injury as a result of enforcement of the challenged statute." *People v. Greco*, 204 Ill. 2d 400, 409 (2003). The claimed injury must be: (1) distinct and palpable; (2) fairly traceable to defendant's actions; and (3)

substantially likely to be prevented or redressed by the grant of the requested relief. *Village of Lake Villa v. Stokovich*, 211 Ill. 2d 106, 119-20 (2004).

¶ 28 Importantly, standing "often turns on the nature and source of the claim asserted." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). Here, defendant argues that the Statutory Scheme constitutes cruel, unusual, and disproportionate punishment. He also claims that it violates his rights to substantive and procedural due process. Because the nature of these claims differs, we must analyze his standing to bring these claims separately. We first look to the justiciability of defendant's eighth amendment and proportionate penalties clause claims, then turn to his due-process challenges.

¶ 29                  B. Standing for Eighth Amendment/Proportionate Penalties

¶ 30 It is clear enough that, in order to have standing to raise a claim of cruel and unusual punishment or disproportionate penalties, a defendant must have actually received punishment. *People v. Matkovick*, 101 Ill. 2d 268, 277 (1984) (defendant lacked standing to raise eighth-amendment challenge to sentencing provision of law banning lookalike drugs because "there ha[d] been no adjudication of guilt *** and no sentence imposed"). Obviously, defendant has already received his punishment—he was found guilty of a sex offense that triggered not only SORA and the Notification Law, but also a host of restrictions on his movement, residency and employment, as well as restrictions related to driver's licenses and name changes.

¶ 31 At first blush, it may seem odd that we would consider the constitutionality of separate statutes that are not, on their faces, sentencing laws. But defendant alleges that these statutes operate as additional punishment for his conviction for aggravated criminal sexual abuse. And whether or not these laws actually constitute "punishment" goes to the merits of defendant's eighth-amendment and proportionate-penalties claims. The merits of a claim do not affect its

justiciability. *Arizona State Legislature v. Arizona Independent Redistricting Comm'n*, 576 U.S.

___, ___, 135 S. Ct. 2652, 2663 (2015); *Warth*, 422 U.S. at 500; see also *Harris Trust & Savings Bank v. Duggan*, 95 Ill. 2d 516, 527 (1983) (distinguishing between merits of challenge and standing to raise it). If we were to determine that defendant lacked standing to challenge these laws because they do not constitute "punishment" for his conviction, we would be hinging defendant's standing on the merits of his argument. Such an analysis would improperly conflate these two distinct inquiries.

¶ 32    It is likewise unusual for a defendant to raise the challenges to these non-sentencing laws on direct appeal from his criminal conviction, when a litigant typically does so in a civil action. The trial court, after all, did not impose these restrictions as part of its sentence. Instead, these laws automatically applied to defendant, no matter the trial court's sentence. But that does not alter the fact that defendant checks all the boxes on the requirements for standing. He must show that he suffered actual or imminent injury, and that the outcome of this proceeding will redress that injury. Whether by operation of law or by judicial decree, the conditions imposed on defendant caused him an injury. Due to his conviction, he is prohibited from knowingly living within 500 feet of a school, day care, or other facility providing services to children. He can never take certain jobs where he is in contact with children, drive any emergency services vehicle, or drive a food truck. He can never knowingly go in a public park or local or state forest preserve. The alleged unconstitutionality—the harshness of these laws as part of his alleged punishment—will affect defendant and sets him apart from most individuals.

¶ 33    Moreover, there is no contingency that needs to occur before these laws apply to defendant: he will be subject to them, for the rest of his life, no matter what occurs. Compare, *e.g.*, *In re C.C.*, 2015 IL App (1st) 142306, ¶ 15 (respondent lacked standing to challenge suspended adult sentence

where at least one contingency had to occur before sentence would ever be imposed); *Alfred Engineering, Inc. v. Illinois Fair Employment Practices Comm'n*, 19 Ill. App. 3d 592, 601 (1974) (finding plaintiffs lacked standing to challenge regulations because "any injury *** is speculative and wholly dependent upon a series of future contingencies"). As a result of defendant's conviction, he will be subject to a lifetime of government surveillance and restraint that will, without doubt, apply to him on his release.

¶ 34 Finally, it is indisputable that a favorable ruling from this court—invalidating these restrictions—would redress these injuries. We therefore find that defendant has standing to raise his claims under the eighth amendment and the proportionate-penalties clause.

¶ 35 We find further support for the notion that defendant has standing in cases addressing defendants' standing to challenge the conditions of their supervised release. For example, in *United States v. Loy*, 237 F.3d 251, 253-54 (3d Cir. 2001), the court held that the defendant, on direct appeal from his conviction for possessing child pornography, had standing to bring a vagueness challenge to a condition of his supervised release prohibiting him from possessing any pornography. The government argued that the defendant had not suffered any injury because he had not been arrested or charged with violating the conditions of his parole. *Id.* at 257. The court rejected that argument, noting that "the fact that a party may be forced to alter his behavior so as to avoid penalties under a potentially illegal regulation is, in itself, a hardship." *Id.* The court reiterated the principle that " 'it is not necessary that [a party] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights.' " *Id.* (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). Also, the defendant's claim was appropriate for judicial review because it involved a straightforward and purely legal issue, federal sentencing statutes showed Congress's intent to allow defendants to

challenge their sentences on direct appeal, and deciding the defendant's claim on direct appeal promoted judicial efficiency. *Id.* at 258, 261.

¶ 36    In this case, defendant argues that, in effect, the laws automatically applicable to him by virtue of his conviction amount to lifetime supervised release conditions. Like the defendant in *Loy*, defendant will have to be on guard to ensure that his day-to-day behavior does not run afoul of the tight controls on his movements and behaviors. Also like the defendant in *Loy*, defendant here raises purely legal questions. And judicial economy would certainly be served by ruling on defendant's claims now, rather than requiring him to file a separate civil suit challenging the statutes at issue or to purposely violate the statutes in order to seek judicial review.

¶ 37    We recognize that the federal standards for standing applied in *Loy* differ from those in Illinois. See *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 491 (1988) ("We are not *** required to follow the Federal law on issues of justiciability and standing."). But we may still look to federal authority as persuasive. *Mekertichian v. Mercedes-Benz U.S.A., L.L.C.*, 347 Ill. App. 3d 828, 835 (2004). And as our supreme court tells us, "[T]o the extent that the State law of standing varies from Federal law, it tends to vary in the direction of greater liberality; State courts are generally more willing than Federal courts to recognize standing ***." *Greer*, 122 Ill. 2d at 491. Thus, we find the above federal authority to be persuasive.

¶ 38    We hold that defendant has standing to challenge the statutory scheme at issue under the eighth amendment and proportionate penalties clause.

¶ 39                    C. Standing for Due Process Challenges

¶ 40    For similar reasons, we also conclude that defendant has standing to raise his substantive and procedural due process claims. In *Messenger v. Edgar*, 157 Ill. 2d 162, 166, 173, 176 (1993), the plaintiff, who had filed for divorce, sought a declaratory judgment that section 501.1 of the

Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/501.1 (West 1992)) violated her rights to substantive and procedural due process. Section 501.1 provided that, when an individual filed for divorce, an automatic stay would be imposed preventing either party to the divorce from disposing of any property via an " 'extraordinary expenditure or transaction.' " *Messenger*, 157 Ill. 2d at 167 (quoting 750 ILCS 5/501.1 (West 1992)). The defendants argued that the plaintiff lacked standing to challenge the law because "there was no evidence that [the] plaintiff made or intended to make any extraordinary transaction or expenditure." *Messenger*, 157 Ill. 2d at 170. The supreme court disagreed, noting that, once she filed her summons in the divorce proceeding, the stay automatically applied to her. *Id.* at 171. Thus, her request for declaratory judgment presented "a concrete dispute" that involved the plaintiff's "right to her property." *Id.* at 171-72. While the court acknowledged that her injury was "merely threatened" because she had not made—and did not say that she intended to make—an extraordinary transaction or expenditure, it noted that "the lack of immediate ascertainable damages" did not deprive her of standing. *Id.* at 172. And the court found that the plaintiff's alleged injury was sufficiently particular, "as opposed to a generalized grievance common to all members of the public." *Id.* Finally, the court noted that, if the plaintiff succeeded, her alleged injury would be redressed, as the automatic stay would be lifted. *Id.*

¶ 41    Like the automatic-stay provision at issue in *Messenger*, the provisions defendant challenges in this case will automatically apply to him on his release. And, like the plaintiff in *Messenger*, defendant in this case alleges that these provisions will impact his fundamental right to liberty. Whether these laws, in fact, do infringe on defendant's fundamental rights goes to the merits of his due-process claims, which should not affect his standing to bring them. *Arizona State Legislature*, 576 U.S. at ___, 135 S. Ct. at 2663; *Warth*, 422 U.S. at 500. Moreover, like the plaintiff in *Messenger*, defendant is not bringing a generalized grievance common to all members

of the public. As a result of his conviction, he will be required to constrain and alter his behavior in a way that a vast majority of the public never will.

¶ 42    *Messenger* also shows that the fact that defendant has not yet violated any of the statutes at issue does not necessarily deprive him of standing. Just as the plaintiff in *Messenger* had not violated the automatic stay or indicated that she wanted to engage in behavior prohibited by the stay, defendant has not violated any of the statues at issue or alleged that he wants to do anything prohibited by the statutes. But, as the court in *Messenger* held, that does not mean that defendant will not be affected by the laws. As we discussed above, he certainly will be.

¶ 43    We conclude that defendant has standing to raise both his eighth-amendment and due-process challenges to the Statutory Scheme. Having made that determination, we turn to the merits of these arguments.

¶ 44                    C. Eighth Amendment/Proportionate Penalties

¶ 45    Defendant first argues that the Statutory Scheme violates the prohibition on cruel and unusual punishment in the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). The State contends that the Statutory Scheme cannot violate these constitutional provisions because the Statutory Scheme does not constitute punishment.

¶ 46    Only governmental action that inflicts "punishment" may be restricted by the eighth amendment and the proportionate penalties clause. *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 207 (2009); see also *People v. Malchow*, 193 Ill. 2d 413, 424 (2000) (sex offender registration did not violate eighth amendment because it was not punishment); *People v. Grochocki*, 343 Ill. App. 3d 664, 670 (2003) ("[T]he proportionate penalties clause is inapplicable because dissemination of his sex-offender status is not 'punishment' or a 'penalty.' "). Defendant recognizes

that, in the past, the Illinois Supreme Court has held that earlier versions of some of these laws do not constitute punishment. But he contends that the Statutory Scheme has changed so much that we should reevaluate whether it constitutes punishment.

¶ 47    In *Malchow*, 193 Ill. 2d at 418-24, the Illinois Supreme Court held that the 1998 version of SORA (730 ILCS 150/1 *et seq.* (West 1998)) was not an improper *ex post facto* law and did not violate the eighth amendment because it did not constitute punishment. Under the 1998 SORA, the sex offender's name, address, date of birth, and offense was given to school boards and child care facilities, and other individuals could request that information from law enforcement. *Id.* at 420. In part because of the "limited dissemination" of the sex offender's personal information, the court found that the legislature intended SORA "to protect the public rather than to punish sex offenders." *Id.*

¶ 48    After *Malchow*, the United States Supreme Court decided *Smith v. Doe*, 538 U.S. 84, 105-06 (2003), where the Court held that Alaska's sex offender registration law did not constitute punishment. That law required convicted sex offenders to provide local law enforcement authorities with their names, aliases, identifying features, addresses, places of employment, dates of birth, conviction information, driver's license numbers, information about vehicles to which they had access, and postconviction treatment histories. *Id.* at 90. Sex offenders were required to register annually for 15 years, unless they had been convicted of an aggravated sex offense or of 2 or more sex offenses, when they were required to register every 3 months for life. *Id.* The law also provided for public dissemination of sex offenders' names, aliases, addresses, photographs, physical descriptions, license plate numbers, places of employment, dates of birth, crimes of conviction, and compliance with the registration requirement. *Id.* at 91. But the law also provided that the offenders' fingerprints, driver's license numbers, anticipated changes of address, and

history of medical treatment would remain confidential. *Id.* at 90-91. The Court rejected the comparison of Alaska's registration system to parole or supervised release, which have been regarded as punishment. *Id.* at 101. The Court found that, under the registration law, sex offenders were "free to move where they wish and to live and work as other citizens, with no supervision," as opposed to parolees, face "a series of mandatory conditions." *Id.*

¶ 49    Our supreme court also addressed the widespread dissemination of sex offenders' information on the Internet in *People v. Cornelius*, 213 Ill. 2d 178 (2004). There, the court addressed the 2002 versions of Illinois's SORA (730 ILCS 150/1 *et seq.* (West 2002)) and Notification Law (730 ILCS 152/101 *et seq.* (West 2002)). *Cornelius*, 213 Ill. 2d at 181-82. Under those laws, sex offenders were required to register with municipal or county law enforcement officials within 10 days of establishing a residence in the municipality or county, giving law enforcement their names, current addresses, current places of employment, photographs, and fingerprints. *Id.* at 181-82. The Notification Law required the Illinois State Police to maintain an Internet database that disclosed sex offenders' registration information. *Id.* at 183. The court found that the widespread dissemination of this information did not make the Notification Law punitive, relying on *Smith*. *Id.* at 207-08.

¶ 50    In *In re J.W.*, 204 Ill. 2d 50, 54-55 (2003), our supreme court addressed a proportionality challenge to SORA's application to a 12-year-old juvenile delinquent. The court again held that SORA was not punishment, relying on *Malchow*'s conclusion that SORA is not a punitive statute, as well as the fact that juvenile sex offenders did not have their registration information disclosed via the Internet and that public access to the juvenile's information was "limited to those whose safety might be compromised for some reason related to the juvenile sex offender." *Id.* at 73-75. Similarly, in *Konetski*, 233 Ill. 2d at 206-08, the court rejected an eighth-amendment challenge to

SORA's application to a juvenile sex offender, finding that the United States Supreme Court's decision in *Roper v. Simmons*, 543 U.S. 551 (2005), did not change the conclusion in *J.W.* that SORA is not punishment.

¶ 51    Defendant acknowledges the holdings of these cases but contends that the current version of the Statutory Scheme far exceeds the burdens in place when any of these cases were decided. Defendant's argument certainly has some merit. As we discussed above, the Statutory Scheme has become more onerous with regard to the amount of information a sex offender must disclose, the number of agencies to which the offender must disclose that information, and how often a sex offender must register. And in this case, defendant challenges laws that directly restrict where he can live, work, and even move about his community. But we decline to revisit the issue of whether the statutory scheme constitutes punishment because, even assuming that it did, we hold that it does not violate the eighth amendment or the proportionate penalties clause.[1]

¶ 52    Defendant claims that the Statutory Scheme constitutes grossly disproportionate punishment that violates the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution, because it imposes a lifelong system of punishment that defendant analogizes to parole or probation.

---

[1] We acknowledge that we have a duty to avoid constitutional questions—such as the merits of defendant's eighth-amendment claim—whenever possible. *In re E.H.*, 224 Ill. 2d 172, 180 (2006). But in avoiding the question of whether the Statutory Scheme should now be considered "punishment," we *are* avoiding a constitutional question—a constitutional question that may have greater reach than the question of whether the Statutory Scheme is cruel and unusual punishment, as the decision on whether the Statutory Scheme constitutes "punishment" could affect future *ex post facto* jurisprudence, which is not at issue here. See *Malchow*, 193 Ill. 2d at 424 (supreme court's determination that sex offender notification law "[did] not constitute punishment" for purposes of *ex post facto* challenge meant that it did not constitute "punishment" for eighth amendment purposes, either). By reaching the merits of defendant's eighth-amendment and proportionate-penalties claims and finding them without merit, we are thus resolving this case on a narrower constitutional ground.

¶ 53    All statutes carry a strong presumption of constitutionality. *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). The legislature has broad discretion in setting criminal penalties. *People v. Taylor*, 102 Ill. 2d 201, 208 (1984); *Sharpe*, 216 Ill. 2d at 487. The legislature's power is not unlimited, however, as the sentences it prescribes must satisfy constitutional constraints. *People v. Morris*, 136 Ill. 2d 157, 161 (1990). Our review of this question of law is *de novo*. *People v. Masterson*, 2011 IL 110072, ¶ 23.

¶ 54    The eighth amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., amend. VIII. The United States Supreme Court has interpreted the eighth amendment to "encompass[ ] a narrow proportionality principle" that prohibits "grossly disproportionate" sentences. (Internal quotation marks omitted.) *Harmelin v. Michigan*, 501 U.S. 957, 997, 1001 (1991).

¶ 55    The proportionate penalties clause of the Illinois Constitution states that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The proportionate penalties clause places two limits on the legislature's ability to prescribe criminal sentences: (1) it prohibits criminal penalties that are "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community"; and (2) it prevents offenses with the same elements from having different sentences. (Internal quotation marks omitted.) *Sharpe*, 216 Ill. 2d at 487, 521. When interpreting the first of these restrictions, our supreme court has held that the proportionate penalties clause is coextensive with the eighth amendment's proportionality requirement. *People v. Patterson*, 2014 IL 115102, ¶ 106. Because defendant's proportionate-penalties challenge in this case is based on the first restriction in the proportionate

penalties clause, we analyze his eighth-amendment and proportionate-penalties arguments by the same standards.

¶ 56     The United States Supreme Court has recognized two ways in which a defendant may succeed on a proportionality claim under the eighth amendment. *Graham v. Florida*, 560 U.S. 48, 59 (2010). The first way is to show that the punishment is "inherently barbaric" and thus unconstitutional "under all circumstances." *Id.* The second way is to show that the challenged punishment is disproportionate to the crime in a particular case. *Id.* Defendant does not attempt the first method in this case, as he concedes that the Statutory Scheme may be suitable punishment for "the most monstrous child molesters." Thus, we consider only whether the Statutory Scheme, as applied to defendant, is disproportionate.

¶ 57     Our supreme court has not directly addressed the issue of whether the Statutory Scheme—or any of the individual statutes that comprise it—constitutes cruel and unusual punishment. Turning to other jurisdictions, however, we find persuasive case law. In *State v. Mossman*, 281 P.3d 153, 156-57 (Kan. 2012), the Kansas Supreme Court held that lifetime post-release supervision was not grossly disproportionate as applied to the 25-year-old defendant, who had pled guilty to having sex with a 15-year-old girl. The factual basis for the defendant's plea showed that the defendant stayed with the girl's family with the permission of her stepfather, and that she and the defendant began a " 'sexual relationship' " while he lived there. *Id.* at 157. As a result of his plea, the defendant was subjected to mandatory, lifetime post-release supervision under Kansas law, which required that he commit no new offenses and that could require him to pay costs, fines and restitution; to complete educational requirements; to perform community service; and to report to a supervising officer. *Id.* If he committed a new offense, he would be subject to a possible life sentence in prison. *Id.*

¶ 58    On appeal, the Kansas Supreme Court first analyzed the seriousness of the offense and the facts of the case. *Id.* at 160. In finding that the defendant's offense was a serious one, the court noted that sex offenses against minors are "considered particularly heinous crimes" that have "particularly devastating effects on victims, including physical and psychological harm." (Internal quotation marks omitted.) *Id.* The court also pointed to the high rate of recidivism among child sex offenders. *Id.* The court rejected the defendant's suggestion that the victim consented to having sex with him because she "encouraged [his] behavior." *Id.* The court stressed that Kansas law treated 15-year-olds as "legally incapable of consenting to sexual intercourse," and that "[a]n adult, such as [the defendant], who comes in contact with a minor, even a seemingly mature minor, is expected to protect the child from the child's poor judgment, not take advantage of that poor judgment." *Id.* While the court recognized that a psychological evaluation had showed that the defendant had a low risk of recidivism, the court also noted that the same evaluation showed that defendant lacked impulse control and had a history of drug use, "which put him at some risk of reoffending." *Id.* at 161.

¶ 59    The court, citing *Graham*, 560 U.S. at 71-74, then noted the importance of whether lifetime post-release supervision served legitimate penological goals "such as deterrence, incapacitation, and rehabilitation." *Mossman*, 281 P. 3d at 161. The court noted that post-release supervision was "largely designed to act as a deterrent to future crime," which was a legitimate goal in light of sex offenders' risk of recidivism. *Id.* Again recognizing the defendant's low score on the recidivism evaluation, the court also highlighted his "lack of impulse control and rebellious character." *Id.* And, the court noted, post-release supervision " 'helps incapacitate sex offenders by keeping them under the watchful eye of probation officers.' " *Id.* (quoting *United States v. Williams*, 636 F.3d 1229, 1234 (9th Cir. 2011)). Finally, the court rejected the defendant's argument that post-release

supervision failed to combat recidivism because the number of offenders subject to it "dilute[d] the ability to effectively rehabilitate or supervise offenders." *Mossman*, 281 P.3d at 161. While the court agreed that "postrelease supervision is not a guarantee against recidivism," it did not follow that supervision was not legitimately related to the penological goal of preventing recidivism. *Id.*

¶ 60    The facts of this case are very similar to those of *Mossman*. Defendant in this case was only two years younger than the defendant in *Mossman*, and he had sex with a girl only one year older than the victim in *Mossman*. Like the Kansas Supreme Court, our supreme court has stressed that protecting children is "a government objective of surpassing importance" (internal quotation marks omitted), and that children suffer psychological damage as a result of sexual assault that "may be even more pernicious" than physical harm. *People v. Huddleston*, 212 Ill. 2d 107, 132, 135 (2004). And, like the court in *Mossman*, we reject defendant's attempt to diminish the seriousness of his crime because he did not use force. Regardless of the absence of force, a 16-year-old is incapable of exercising sexual consent under Illinois law. See *People v. Lloyd*, 2013 IL 113510, ¶ 30 ("[T]he prescribed age of consent in Illinois is 17, although in a few instances where the accused is a family member or a person in a position of trust or authority, the age of consent is 18 [citation]."). Even if defendant believed her to be mature enough to consent to sex, that does not excuse his exploitation of M.H.'s inherent immaturity. See *id.* ¶ 35 ("[I]t is of no concern how advanced, knowledgeable, or willing a particular minor might be about sexual activity because he or she is incapable of giving legal consent.").

¶ 61    We also agree with the Kansas Supreme Court's determination that lifetime monitoring of sex offenders serves legitimate penological goals. As we outlined above, as a result of defendant's conviction for aggravated criminal sexual abuse, he will be required to register as a sex offender, comply with the ongoing reporting and registration requirements of SORA, and will be prohibited

from living, working, or going near places where minors are frequently present. These features all focus on keeping individuals convicted of sex offenses against minors, like defendant, away from minors and diminishing the likelihood that they will repeat their crimes.

¶ 62    We acknowledge that the Statutory Scheme does not precisely match the circumstances of defendant's particular offense. For example, defendant's crime does not indicate that he would be likely to target preadolescent children, making the restrictions on his presence near a day care facility seem unnecessary. But for purposes of our proportionality analysis, we must simply determine whether a statute serves legitimate penological goals. We are not tasked with determining whether a certain sentence *best* serves certain penological goals. That delicate balancing should be reserved for the legislative process.

¶ 63    Notably, unlike *Mossman*, defendant can point to no evidence in the record showing that he is unlikely to recidivate. And although he has no prior convictions for sex offenses, his prior convictions for burglary, possession of cannabis, possession of a stolen motor vehicle, and domestic battery suggest that he lacks some impulse control and a general tendency to recidivate.

¶ 64    Defendant compares his case to *People v. Miller*, 202 Ill. 2d 328, 330, 341 (2002), where our supreme court held that a mandatory life sentence for a 15-year-old defendant convicted of two counts of murder under an accountability theory violated the proportionate penalties clause. In striking down the defendant's sentence as shocking to the moral sense of the community, the court highlighted the defendant's age and his diminished culpability as an accomplice:

"This moral sense is particularly true, as in the case before us, where a 15-year-old with one minute to contemplate his decision to participate in the incident and stood as a lookout during the shooting, but never handled a gun, is subject to life imprisonment with no possibility of parole—the same sentence applicable to the actual shooter." *Id.* at 341.

That diminished culpability, along with the defendant's "greater rehabilitative potential" as a juvenile, led the court to conclude that a natural life sentence was grossly disproportionate to the severity of the defendant's conduct. *Id.* at 341-42.

¶ 65    This case is not analogous to *Miller*. Defendant was not an adolescent; he was 23 years old at the time of his offense. And he was not convicted under an accountability theory. Thus, defendant had neither the inherent rehabilitative potential, nor the diminished culpability, of the juvenile defendant in *Miller*. Moreover, defendant was not sentenced to life in prison like the defendant in *Miller*; he was sentenced to six years' incarceration, accompanied with lifetime sex offender registration requirements and restrictions on his residence, employment, and movements. Defendant's sentence and accompanying restrictions, harsh as they may be, are not as onerous as the juvenile's life sentence in *Miller*.

¶ 66    Furthermore, the United States Supreme Court has held that lifelong terms of incarceration do not violate the eighth amendment, even when the offender has been convicted of offenses that are minor compared to having sex with a minor. See, *e.g.*, *Ewing v. California*, 538 U.S. 11, 28-31 (2003) (25 years to life for stealing golf clubs); *Harmelin*, 515 U.S. at 994-96 (life without parole for possessing 672 grams of cocaine); *Rummel v. Estelle*, 445 U.S. 263, 275-85 (1980) (life sentence for stealing $120 under false pretenses).[2] And defendant has not been sentenced to a lifetime in prison, or even a particularly lengthy prison term. Admittedly, he will be monitored and

---

[2] We acknowledge that the defendants in *Ewing*, *Harmelin*, and *Rummel* were each sentenced under recidivist provisions that required the imposition of harsh sentences for repeat offenders, which suggests that their lengthy sentences were imposed due to the defendants' pattern of criminality, not simply for their relatively minor offenses of conviction. But defendant has displayed his own pattern of recidivism: he was sentenced in the Class X range (6 to 30 years' incarceration) because of his two prior convictions for burglary and possession of a stolen motor vehicle. See 730 ILCS 5/5-4.5-95(b) (West 2012) (requiring Class X sentencing range for offender convicted of three Class 2 or greater offenses).

bound by strict limits on his freedom for the rest of his life, but even the system of "harsh probation" with which he takes issue is not the same as a lifetime of incarceration. See *Williams*, 636 F.3d at 1232 ("[A]lthough supervised release limits a criminal's liberty and privacy, it is a punishment far less severe than prison."); *United States v. Bridges*, 760 F.2d 151, 154 (7th Cir. 1985) ("The imposition of a lifetime parole term is neither tantamount to a sentence of life imprisonment nor *per se* cruel and unusual punishment."); *United States v. Walden*, 578 F.2d 966, 972 (3d Cir. 1978) ("We do not accept appellant's argument that the [lifetime] parole term is 'tantamount to life imprisonment.' ").

¶ 67    We conclude that, even if the Statutory Scheme were a system of "punishment"—a question we do not decide—it is not grossly disproportionate to defendant's offense. We therefore reject defendant's claims that the Statutory Scheme violates the prohibition on cruel and unusual punishment or disproportionate penalties.

¶ 68                                    D. Due Process

¶ 69    Defendant next argues that the Statutory Scheme violates the due process clauses of the United States and Illinois Constitutions. U.S. Const. amend. XIV; Ill. Const. 1970, art. I, § 2. He alleges that it violates his right to substantive due process because it infringes on his fundamental constitutional rights and is an irrational method of protecting the public. He also alleges that it violates his right to procedural due process because it infringes on his liberty interests without proper procedural safeguards. We address both of these arguments in turn.

¶ 70                                 1. Substantive Due Process

¶ 71    When addressing a substantive due process claim, we must first determine "the nature of the right purportedly infringed upon by the statute." *Cornelius*, 213 Ill. 2d at 203. If the statute infringes on a fundamental right, we apply strict scrutiny to the statute. *People v. R.G.*, 131 Ill. 2d

328, 342 (1989). Under strict scrutiny, the statute must serve a compelling government interest and be narrowly tailored (*i.e.*, be the least restrictive means) to serve that interest. *Cornelius*, 213 Ill. 2d at 204. If the statute does not impact a fundamental right, then we apply the rational-basis test to the statute. *Id.* at 203. Under the rational-basis test, the statute must simply bear a rational relationship to any legitimate government interest. *People v. Boeckmann*, 238 Ill. 2d 1, 7 (2010).

¶ 72    In conducting a substantive due process analysis, we "must begin with a careful description of the asserted right, for '[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.' " *Reno v. Flores*, 507 U.S. 292, 302 (1993) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)). Because the substantive portion of the due process clause protects only those fundamental rights that are "deeply rooted in this Nation's history and tradition [citations], and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed," we must use our nation's "history, legal traditions, and practices" as "the crucial guideposts for responsible decisionmaking." (Internal quotation marks omitted.) *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).

¶ 73    Here, defendant claims that "the right to be free from a lifetime of burdensome, intrusive monitoring and restrictions constitutes a fundamental right." He recognizes that Illinois courts "have not recognized the right to be free from registration as a fundamental right" but claims that we should recognize a fundamental right to be free from the type of government surveillance imposed on him.

¶ 74    As defendant has recognized, the weight of authority shows that laws similar to the Statutory Scheme do not affect fundamental rights. Our supreme court has stated that SORA does not affect fundamental rights. *J.W.*, 204 Ill. 2d at 67. With respect to the Notification Law, our

supreme court has held that Internet dissemination of sex offenders' personal information does not impact fundamental rights because "the right to be free from the shame, stigma and embarrassment resulting from a conviction for sexually abusing a child is not the kind of fundamental right contemplated by our constitution." (Internal quotation marks omitted.) *Cornelius*, 213 Ill. 2d at 204; see also *Paul v. Davis*, 424 U.S. 693, 701 (1976) (damage to reputation does not deprive individual of protected liberty or property interest).

¶ 75    Similarly, Illinois courts have rejected the notion that employment or residency restrictions on sex offenders violate their fundamental rights. See, *e.g.*, *Rodrigues v. Quinn*, 2013 IL App (1st) 121196, ¶¶ 1-2, 7 (provision requiring revocation of nursing license for individual convicted of sex offense did not implicate fundamental rights because "right to pursue a profession is not a fundamental right for due process purposes" (internal quotation marks omitted)); *People v. Leroy*, 357 Ill. App. 3d 530, 534 (2005) (rejecting claim that residency restriction affected fundamental right to decide who to live with because defendant did not have fundamental right "to live with his mother and enjoy her support within 500 feet of a school"). Nor do we find that the driver's-license provision affects fundamental rights because the right to drive and the right to possess a driver's license is not a fundamental right. *Guerrero v. Ryan*, 272 Ill. App. 3d 945, 951 (1995). And defendant has not cited any authority—nor have we found any—to support the notion that he has a fundamental right affected by the prohibition on changing his name. See *In re Marriage of Charnogorsky*, 302 Ill. App. 3d 649, 660 (1998) (finding no authority to support notion that naming one's child is fundamental right).

¶ 76    Finally, while we have found no Illinois precedent specifically addressing whether prohibitions on sex offenders' presence near school property or public parks affects their fundamental rights, we find the Seventh Circuit Court of Appeals' analysis in *Doe v. City of*

*Lafayette*, 377 F.3d 757, 770-71 (7th Cir. 2004), to be persuasive. There, the City of Lafayette, Indiana issued the plaintiff a letter informing him that he had been banned from all public parks in the city. *Id.* at 758. The plaintiff had a "long history of arrests and convictions for sexually related crimes," most of which involved children. *Id.* He sued the city, alleging that the letter deprived him of his fundamental rights under the substantive due process clause. *Id.* at 768. The court rejected the plaintiff's contention that substantive due process included "a generalized right to movement." *Id.* at 769. The court also rejected the notion that the plaintiff had a fundamental right "to enter the parks to loiter or for other innocent purposes." *Id.* The court recognized that such a right was "not unimportant," but found that it was an "uncomfortable fit" with the previously-recognized fundamental rights relating to marriage, bodily integrity, and familial rights. *Id.* at 770. And the court could find only indirect "historical or precedential support for a fundamental right to enter parks for enjoyment." *Id.* at 771. Here, defendant has pointed to no authority for the notion that Illinois's ban on his presence in certain areas affects his fundamental rights. Consequently, like the court in *Doe v. City of Lafayette*, we decline to recognize a new fundamental right relating to defendant's presence on school property or in public parks.

¶ 77    Defendant cites *Weems v. United States*, 217 U.S. 349 (1910), in support of his contention that the Statutory Scheme infringes on his fundamental rights. In *Weems*, the defendant, a disbursing officer for the United States Government in the Philippines (the Philippines were a United States colony at the time), was convicted of falsifying a public document. *Id.* at 357-58. The defendant was sentenced to 12 to 20 years' imprisonment, during which time he would be "employed at hard and painful labor" while "always carry[ing] a chain at the ankle, hanging from the wrist." (Internal quotation marks omitted.) *Id.* at 364. While serving his prison term, he was deprived of "the rights of parental authority, guardianship of person or property, participation in

the family council, [and] marital authority," and was prohibited of disposing of his own property. *Id.* at 364. The sentence also subjected the defendant to "surveillance" after his release, which required him to notify the authorities of his address, prohibited him from moving "without the knowledge and permission" of the police, obliged him to "observe the rules of inspection," and required that he "adopt some trade, art, industry, or profession should he not have known means of subsistence of his own." (Internal quotation marks omitted.) *Id.*

¶ 78    The Court held that the sentence violated the Philippines' prohibition on cruel and unusual punishment, which, according to the Court, carried the same meaning as the eighth amendment. *Id.* at 365-82. In discussing the surveillance portion of the defendant's sentence, the Court stated:

> "His prison bars and chains are removed, it is true, after twelve years, but he goes from them to a perpetual limitation of his liberty. He is forever kept under the shadow of his crime, forever kept within voice and view of the criminal magistrate, not being able to change his domicil [*sic*] without giving notice to the authority immediately in charge of his surveillance, and without permission in writing. He may not seek, even in other scenes and among other people, to retrieve his fall from rectitude. Even that hope is taken from him and he is subject to tormenting regulations that, if not so tangible as iron bars and stone walls, oppress as much by their continuity, and deprive of essential liberty." (Internal quotation marks omitted.) *Id.* at 366.

¶ 79    Defendant argues that the above-quoted passage shows that a right against government surveillance is deeply rooted in our Nation's history and, thus, is a fundamental right. But *Weems* did not involve a fundamental-rights analysis under the substantive due process clause. Instead, it involved an eighth-amendment challenge to a criminal sentence. *Id.* at 367. Moreover, *Weems* involved a system of punishment far more harsh and intrusive than defendant's obligations as a sex

offender. In fact, it involved incarceration, hard labor, constant shackling, and deprivation of the right to marry or parent one's children—rights which are considered fundamental under the due process clause. See *Glucksberg*, 521 U.S. at 720 (rights "to have children," "to marry," "to direct the *** upbringing of one's children" are fundamental). Even the surveillance at issue in *Weems*, by itself, was more intrusive than the statutory scheme in this case, as the defendant in *Weems* was required to get the authorities' prior permission to move, whereas defendant must simply apprise the authorities of any change in his address or other registration information. See *Russell v. Gregoire*, 124 F.3d 1079, 1088 (9th Cir. 1997) (distinguishing surveillance in *Weems* from sex offender registration because "[o]btaining permission to move is a much greater burden than simple registration"); *Artway v. Attorney General of the State of New Jersey*, 81 F.3d 1235, 1266 (3d Cir. 1996) (distinguishing surveillance in *Weems* from sex offender registration because it "differed from [registration] in at least one significant respect: the *** offender in *Weems* was required to obtain written permission before he could move"). And although defendant cannot live near schools, day cares, or other areas where children are often present, even this restriction does not amount to the vague "permission"—permission that appeared to be capable of being granted or denied entirely at the whims of the police—the defendant was required to obtain in *Weems*. While undoubtedly burdensome, the sex offender regulations at issue in this case do not approach the level of government intrusion at issue in *Weems*.

¶ 80    Defendant also cites *Doe v. Attorney General*, 686 N.E.2d 1007 (Mass. 1997), and *State v. Guidry*, 96 P.3d 242 (Haw. 2004), in support of his claim that he has a fundamental right to be free from government surveillance. But both of these cases dealt with *procedural* due process arguments, not *substantive* due process arguments. *Doe v. Attorney General*, 686 N.E.2d at 1008; *Guidry*, 96 P.3d at 245. This distinction is critical, because the substantive due process clause

establishes that the government may not infringe on certain rights created by the due process clause itself, whereas the procedural due process clause protects any life, liberty, or property interest—whether created by the constitution or not—on which the government attempts to infringe. See *Evans v. Secretary Pennsylvania Department of Corrections*, 645 F.3d 650, 663 (3d Cir. 2011) ("[T]he interests protected by procedural due process are much broader than those protected by substantive due process ***."); *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 880 n.13 (1st Cir. 2010) ("Courts must be careful not to inject the more demanding fundamental rights and liberties analysis from the substantive due process sphere into the liberty interest analysis that pertains to the procedural due process inquiry."); *Bell v. Ohio State University*, 351 F.3d 240, 249-50 (6th Cir. 2003) ("The interests protected by substantive due process are *** much narrower than those protected by procedural due process."). Thus, *Doe v. Attorney General* and *Guidry* are inapplicable to defendant's substantive due process claim.

¶ 81    Having found that the Statutory Scheme does not impact defendant's fundamental rights, we apply rational basis review. As we stated above, rational-basis review requires us to ask two questions: (1) whether there is a legitimate state interest behind the statutes; and, if so, (2) whether the statutes are rationally related to that legitimate state interest. *People v. Johnson*, 225 Ill. 2d 573, 584 (2007).

¶ 82    Defendant does not contend that the Statutory Scheme does not serve a legitimate interest. In fact, he recognizes that it serves "the goal of protecting the public from sex offenders." We agree. See *J.W.*, 204 Ill. 2d at 68 (Notification Law designed to protect public from sex offenders); *People v. Adams*, 144 Ill. 2d 381, 390 (1991) (SORA designed to protect public from sex offenders). Thus, we turn to whether the Statutory Scheme bears a rational relationship to that goal.

¶ 83    Defendant argues that the Statutory Scheme is irrational because it "lacks any mechanism by which a determination can be made as to a registrant's danger of re-offending." In other words, defendant argues, it is "over-inclusive." But under rational-basis review, a statute "is not fatally infirm merely because it may be somewhat underinclusive or overinclusive." *Maddux v. Blagojevich*, 233 Ill. 2d 508, 547 (2009). Even a law that is " 'unwise, improvident, or out of harmony with a particular school of thought' " is not necessarily irrational. *Harris v. Manor Healthcare Corp.*, 111 Ill. 2d 350, 369 (1986) (quoting *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 488 (1955)). And the law " 'need not be in every respect logically consistent with its aims to be constitutional.' " *Id*. (quoting *Williamson*, 348 U.S. at 487-88).

¶ 84    Although we recognize that the Statutory Scheme at issue may be over-inclusive—that is, it may impose burdens on individuals who pose no threat to the public because they will not reoffend—it still has a rational relationship to protecting the public. As our supreme court has held, SORA and the Notification Law help law enforcement and private individuals keep track of sex offenders by providing information about their presence and offenses. *Cornelius*, 213 Ill. 2d at 205; *J.W.*, 204 Ill. 2d at 67-68. Similarly, by keeping sex offenders who have committed offenses against children away from areas where children are present (*e.g.*, school property and parks) and out of professions where they could come in contact with children (*e.g.*, driving an ice cream truck, being a shopping-mall Santa Claus) or vulnerable people (*e.g.*, driving an emergency services vehicle), the legislature could have rationally sought to avoid giving certain offenders the opportunity to reoffend. Whether or not the Statutory Scheme is a finely-tuned response to the threat of sex-offender recidivism is not a question for rational-basis review; that is a question for the legislature.

¶ 85    We also find *In re Taylor*, 343 P.3d 867 (Cal. 2015), to be helpful by way of contrast. In

*Taylor*, a group of sex offenders from San Diego County challenged a statute prohibiting any sex offender from residing within 2000 feet of any school or park. *Id.* at 869. There, after hearing extensive evidence on the difficulties that the sex offenders had in finding housing (*id.* at 871-76), the trial court found that "registered sex offender parolees [were] effectively barred from access to approximately 97 percent of the existing rental property" in the county, that the remaining 3 percent of available housing would be unavailable to most sex offenders due to high rents and low vacancies, that parole officers in the county had taken affirmative steps to prevent parole agents from helping sex offenders find housing, that the residency restrictions led to large groups of sex offenders being homeless, and that the residency restrictions "hinder[ed] [sex offenders'] treatment, jeopardize[d] their health and undercut[ ] their ability to find and maintain employment." *Id.* at 876-77. The trial court concluded that the residency restrictions "significantly undermin[ed]" any effort to rehabilitate these sex offenders. *Id.* at 877. Thus, the trial court found that the residency restriction was unreasonable. *Id.* The California Supreme Court affirmed the trial court's findings. *Id.* at 880-82. The court held that the residency restriction could not "survive rational basis scrutiny because it ha[d] hampered efforts to monitor, supervise, and rehabilitate such parolees in the interests of public safety, and as such, bears no rational relationship to advancing the state's legitimate goal of protecting children from sexual predators." *Id.* at 882.

¶ 86    Unlike *Taylor*, this case does not involve detailed factual findings showing that Illinois's sex offender laws undermine the very goal that they were designed to serve. Defendant did not file a civil suit and seek an evidentiary hearing before the trial court; he is raising these issues on direct appeal from a criminal conviction—his right, but also his choice. Based solely on the record before us, we cannot say that the laws at issue here are an irrational means to protect the public from sex offenders.

¶ 87                                2. Procedural Due Process

¶ 88    Finally, defendant contends that the statutory scheme at issue in this case violates procedural due process. The procedural due process clause entitles individuals to certain procedures before the State may deprive them of a life, liberty, or property interest. *Konetski*, 233 Ill. 2d at 201. "The fundamental requirements of due process are notice of the proceeding and an opportunity to present any objections." *Id.* But not all situations require the same amount of procedural safeguards. *Id.* Instead, we look to three factors to determine how much process is due: (1) the private interest that will be affected by the government action; (2) the risk of an erroneous deprivation of that private interest through the procedures used and the probable value of additional procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that additional procedures would entail. *Id.*

¶ 89    The first step in our analysis would ordinarily be asking whether the Statutory Scheme deprives defendant of a life, liberty, or property interest. We need not resolve this question, however, because, even if we were to assume that these laws affect defendant's liberty or property interests, no additional procedures would be necessary to satisfy due process.

¶ 90    Defendant contends that the missing procedure in this case is a mechanism by which the state should evaluate his risk of reoffending. According to defendant, such a procedure would ensure that the burdensome restrictions of these laws are only placed on those who actually pose a risk of committing additional sex crimes.

¶ 91    But the United States Supreme Court rejected a nearly identical argument in *Connecticut Department of Public Safety v. Doe*, 538 U.S. 1 (2003). There, the Court held that Connecticut was not required to hold a "hearing to determine whether [sex offenders] are likely to be 'currently dangerous' " before requiring them to register. *Id.* at 4. The Court noted that Connecticut's

sex-offender registration system "turn[ed] on an offender's conviction alone—a fact that a convicted offender has already had a procedurally safeguarded opportunity to contest." *Id.* at 7. Because the defendant's current dangerousness was "of no consequence" under Connecticut law, individuals were not entitled to a hearing to prove something that had no relevance to their registration. *Id.* The Court concluded, "Unless respondent can show that [Connecticut's] *substantive* rule of law is defective (by conflicting with a provision of the Constitution), any hearing on current dangerousness is a bootless exercise." (Emphasis in original.) *Id.* at 7-8.

¶ 92    This court has adopted the rationale of *Connecticut Department of Public Safety* when faced with arguments that sex offenders in Illinois should have an opportunity to show whether they are likely to reoffend. *People v. Stanley*, 369 Ill. App. 3d 441, 448-50 (2006); *In re J.R.*, 341 Ill. App. 3d 784, 795-96 (2003). That is because Illinois's system, like Connecticut's, is based entirely on the offense for which a sex offender has been convicted. A sex offender's likelihood to reoffend is not relevant to that assessment. As the Court held in *Connecticut Department of Public Safety*, defendant had no right to a procedure where he could prove a fact that had no relevance to his registration. Defendant offers no persuasive reason to depart from these cases. We conclude that defendant was not denied his right to procedural due process.

¶ 93                          III. CONCLUSION

¶ 94    For the reasons stated above, we affirm defendant's conviction and sentence. Even if it were true that the Statutory Scheme at issue constituted "punishment," it is not a grossly disproportionate punishment for defendant's crime. The Statutory Scheme does not infringe on defendant's fundamental rights under the substantive due process clause, is rationally related to the goal of protecting the public, and does not violate the procedural due process clause by failing to give defendant a hearing on his likelihood to reoffend.

¶ 95    Affirmed.